SCHUTTE, Admr., et al. Appellants,

v.

MOONEY et al., Appellees.

[Cite as *Schutte v. Mooney*, 165 Ohio App.3d 56, 2006-Ohio-44.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 20888.

Decided Jan. 6, 2006.

58

William A. Davis and N. Gerald DiCuccio, for appellant.

Mark L. Schumacher and Sandra R. McIntosh, for appellees.

WOLFF, Judge.

{¶ 1} George Schutte, individually and as administrator of the estate of his wife, Cheryl A. Schutte, appeals from a judgment of the Montgomery County Court of Common Pleas, which granted a directed verdict in favor of Joseph F. Mooney, M.D., on Schutte's medical-malpractice claim, after excluding Schutte's expert witness.

{¶ 2} According to Schutte's pretrial statement of facts, on January 15, 1999, Cheryl Schutte sought treatment from her gynecologist, Dr. Moezzi, for excessive and prolonged menstrual bleeding. Her gynecologist prescribed a short course of birth-control pills to control the bleeding. One of the risks of birth-control pills is the formation of blood clots in the legs, known as deep vein thrombosis ("DVT"). If blood clots form, they present the additional risk that the clots will propagate upward or break off and travel to the lungs, a condition known as pulmonary embolus. If pulmonary emboli occur and are large or numerous enough, the clots can block off the flow of blood into the lungs, causing sudden

death. Mrs. Schutte was advised of the potential side effects of the pills and of the symptoms.

{¶ 3} On January 21, 1999, Mrs. Schutte began to experience cramping in her left calf. She immediately stopped taking the birth-control pills. When the pain increased, Mrs. Schutte contacted Dr. Moezzi's office; she was advised to see her family doctor. On January 23, 1999, Schutte found his wife crying and unable to walk due to the severity of her leg pain. He immediately drove her to Community Health Net Urgent Care Center, where she was seen by Dr. Weber. After an examination, Dr. Weber suspected that Mrs. Schutte had developed DVT, and she was advised to go immediately to the emergency room at Mercy Medical Center in Springfield. Dr. Weber also called the emergency room concerning her suspicions and indicated that Mrs. Schutte was on her way.

{¶ 4} Upon arrival at the emergency room, Mrs. Schutte gave a complete history to Dr. Mooney, who then conducted a physical evaluation, which was negative other than for the calf pain. Dr. Mooney ordered a venous Doppler ultrasound study of her left leg. The purpose of the test was to determine whether blood flow in a vein had been obstructed, such as by a clot. The test was interpreted as showing no evidence of blood clots in the areas that could be seen. However, the middle third of the thigh, known as the adductor canal, could not be seen. Dr. Mooney informed Mrs. Schutte that the test was negative and discharged her with the diagnosis of "left calf strain/contusion."

{¶ 5} Mrs. Schutte's leg pain continued to wax and wane. On January 27, 1999, she returned to her gynecologist. No further treatment for her leg was given. On February 2, 1999, Mrs. Schutte saw her primary-care physician, Dr. Marsh. Dr. Marsh sent Mrs. Schutte for a repeat ultrasound, which was performed that same day. The ultrasound report indicated to Dr. Marsh that the test was incomplete, as the area from the Hunter's canal (the same area as the adductor canal) to the upper knee could not be seen.

{¶ 6} On February 4, 1999, Mrs. Schutte began to experience shortness of breath while at work. She called her husband, who told her to go to the nearest urgent-care center. Mrs. Schutte drove to Mercy Northside Urgent Care Center and collapsed as she was walking in the door. Emergency medical technicians were called, and Mrs. Schutte was rushed to the emergency department at Mercy Medical Center, where she was pronounced dead. An autopsy revealed that Mrs. Schutte had died as a result of pulmonary thromboembolism.

{¶ 7} On January 21, 2003, Mr. Schutte brought suit against Drs. Moezzi, Marsh, and Mooney and their corporate employers for medical malpractice and loss of consortium. Prior to trial, Drs. Moezzi and Marsh and their respective employers were dismissed from the litigation. On January 10, 2005, a trial commenced against Dr. Mooney and his corporate employer. After two wit-

nesses had testified on Schutte's behalf, Schutte prepared to present the testimony of his expert, Dr. Blair D. Vermilion, a vascular surgeon. Dr. Mooney objected under Evid.R. 702(B) to Dr. Vermilion's qualifications to testify as to the standard of care to be applied to an emergency-room physician.

{¶ 8} After a hearing was held outside the presence of the jury, the trial court sustained Dr. Mooney's objection. Citing *Taulbee v. Dunsky,* Butler App. No. CA2003–03–059, 2003-Ohio-5988, 2003 WL 22532931, the court reasoned that Dr. Vermilion had not had experience working in an emergency room for approximately 28 years, that Dr. Vermilion had not "kept up on the skills in regard to emergency room physicians and different matters involving emergency room training," and Dr. Vermilion "does not have sufficient knowledge, skill, expertise, experience, training and education in the field of emergency * * * medicine to testify regarding the standard of care in diagnosing the treatment [of] the disease in this case in the emergency room setting."

{¶ 9} In light of the court's ruling, Schutte stipulated that the only other physician that he intended to present, Dr. Penn, also lacked recent experience in emergency-room medicine and specialized skill, knowledge, experience, training, or education in emergency medicine. Indicating that these were his only witnesses regarding the standard of care, Schutte rested his case. As anticipated by Schutte, Dr. Mooney moved for a directed verdict, which was granted.

{¶ 10} On January 13, 1999, the trial court entered final judgment in favor of Dr. Mooney. In its decision, the court reiterated that Dr. Vermilion was not excluded "because of the difference in his specialty from that of the Defendant Mooney, but because he does not have recent experience interfacing with patients who went to emergency rooms, nor has he established that he has the specialized knowledge, skill, experience, training or education in emergency room care, and thus, Dr. Vermilion is not qualified to testify regarding the standard of care to be applied to an emergency room physician in making the diagnosis in this case."

{¶ 11} Schutte raises two assignments of error on appeal, which we will address in reverse order.

{¶ 12} II. "The trial court erred to the prejudice of plaintiff in sustaining defendants' motion to exclude plaintiff's expert witness, where such motion was not asserted until after the commencement of trial, nine months after taking the deposition of the witness, and at a time when plaintiff could neither voluntarily dismiss the action nor obtain the testimony of another expert witness."

{¶ 13} In his second assignment of error, Schutte claims that the trial court erred in finding Dr. Mooney's motion to exclude Dr. Vermilion's testimony to be timely in the absence of any local rule requiring that the motion be made

prior to trial. Schutte argues that Dr. Mooney's motion should have been deemed waived due to the injustice created by the timing of his motion.

{¶ 14} In support of his argument, Schutte cites Judge Walsh's dissent in *Taulbee*, in which the defendant-physician had similarly challenged the competency of the plaintiff's expert to testify to the standard of care after the trial had begun. Judge Walsh stated:

{¶ 15} "I am equally troubled by the tactics permitted to be employed in this case. Waiting until mid-trial to challenge the expert's knowledge of the appropriate standard of care left appellant with no recourse once the testimony was excluded. Without this expert testimony, appellant failed to sustain her burden as a matter of law, resulting in a directed verdict in favor of appellees. Although not procedurally required, a challenge to such expert testimony is better suited to a pretrial motion. Raising the issue pretrial would provide an opportunity to the parties to locate a different expert witness if required. This would result in a fair and just opportunity to present the respective parties' cases to the court or jury.

{¶ 16} "While the trial court had discretion to rule on the evidentiary question, I feel that it failed to appropriately consider the consequence of its ruling. In an instance such as this, where there is evidence tending to support both permitting and excluding the expert testimony, and the exclusion of the testimony bars the plaintiff from proceeding further, I would conclude that the trial court's decision excluding the testimony is both arbitrary and unreasonable. I would thus reverse the decision of the trial court as an abuse of discretion." *Taulbee*, 2003-Ohio-5988, at ¶ 31–32.

{¶ 17} In the present case, Schutte first disclosed that he intended to use Dr. Vermilion as an expert witness on July 19, 2003. Dr. Vermilion's deposition was subsequently taken on April 7, 2004, nine months prior to trial. Although Dr. Mooney was thus aware of Dr. Vermilion's qualifications and anticipated testimony, he made no pretrial motion to challenge the competency of Dr. Vermilion to testify as an expert witness. Rather, Dr. Mooney first challenged Dr. Vermilion's competency to testify as to the standard of care on January 11, 1999, during Schutte's case-in-chief at the trial.

{¶ 18} As did Judge Walsh, we sympathize with Schutte's predicament in this case. Schutte indicated that this action had previously been voluntarily dismissed without prejudice, pursuant to Civ.R. 41(A)(1)(a), by Schutte's former counsel. Consequently, when the trial court granted Dr. Mooney's motion to exclude Dr. Vermilion's testimony, Schutte could not voluntarily dismiss the action and refile it at a later time, nor did he have time to obtain another expert witness on the standard of care. At best, Schutte could have sought to continue the trial. However, in light of the fact that the trial had already commenced, it is doubtful that such a motion would have been granted.

{¶ 19} Although we do not applaud Dr. Mooney's 11th-hour challenge to Dr. Vermilion's competency to testify to the applicable standard of care, the trial court did not err when it concluded that the motion was proper. While it may well be more equitable to require a pretrial challenge to an expert's competency when such testimony is required to establish a prima facie case, Schutte has not cited any civil or local rule that requires such a challenge. Dr. Mooney was within his rights to challenge Dr. Vermilion's expert testimony, in the first instance, at trial. See *Gallagher v. Cleveland Browns Football Co.* (1996), 74 Ohio St.3d 427, 659 N.E.2d 1232 (noting that the affirmative defense of primary assumption of risk was not waived by the failure to raise the issue in a motion for summary judgment, but it was waived when not raised until a motion for judgment notwithstanding the verdict); compare *Dardinger v. Anthem Blue Cross & Blue Shield*, 98 Ohio St.3d 77, 2002-Ohio-7113, 781 N.E.2d 121 (defendant waived claim that it was liable only as a guarantor when, although the claim was asserted in its answer, it did not raise the issue until a motion for judgment notwithstanding the verdict).

{¶ 20} Schutte's second assignment of error is overruled.

{¶ 21} I. "The trial court abused its discretion and erred to the prejudice of plaintiff in excluding plaintiff's expert witness from testifying as to the standard of care required of the defendant emergency physician, where the witness had testified to his knowledge and familiarity with such standard of care which is common to, known and required of any physician of any specialty, including emergency medicine."

{¶ 22} In his first assignment of error, Schutte claims that the trial court abused its discretion when it relied upon *Taulbee* and excluded Dr. Vermilion's testimony.

{¶ 23} Under Evid.R. 702, a witness may testify as an expert when "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; [and] (C) The witness' testimony is based on reliable scientific, technical, or other specialized information."

{¶ 24} In a medical-malpractice case, it is not required that the witness practice in the same specialty as the defendant-physician. "Where * * * fields of medicine overlap and more than one type of specialist may perform the treatment, a witness may qualify as an expert even though he does not practice the same specialty as the defendant." *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 158, 10 O.O.3d 332, 383 N.E.2d 564. The witness must demon-

strate, however, that he is familiar with the standard of care applicable to the defendant's school or specialty and that his familiarity is "sufficient to enable him to give an expert opinion as to the conformity of the defendant's conduct to those particular standards and not to the standards of the witness' school and, or, specialty if it differs from that of the defendant." Id. at 160, 10 O.O.3d 332, 383 N.E.2d 564. "[I]t is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of his qualifications." Id.

{¶ 25} It is well established that the expert witness need not be the best witness on the subject. *Alexander*, 56 Ohio St.2d at 159, 10 O.O.3d 332, 383 N.E.2d 564. "[T]he test of admissibility is whether a particular witness offered as an expert will aid the trier of fact in the search of the truth." *Ishler v. Miller* (1978), 56 Ohio St.2d 447, 453, 10 O.O.3d 539, 384 N.E.2d 296.

{¶ 26} Whether a witness is qualified to testify as an expert is a matter for the court to determine pursuant to Evid.R. 104(A). *Bedard v. Gardner*, Montgomery App. No. 20430, 2005-Ohio-4196, 2005 WL 1939820, ¶ 58. The competency of the proposed expert witness is a matter left to the discretion of the trial court, and the court's ruling will be reversed only for an abuse of discretion. *Alexander*, 56 Ohio St.2d at 157, 10 O.O.3d 332, 383 N.E.2d 564.

{¶ 27} Dr. Mooney asserts that the trial court properly followed the Twelfth District's decision in *Taulbee* in excluding Dr. Vermilion's testimony. In *Taulbee*, the plaintiff sued his family physician and an emergency-room physician after they failed to diagnose him with an aortic dissection. At trial, the plaintiff presented the testimony of Dr. Alan Markowitz, a cardiothoracic surgeon. When he was asked his opinion on the standard of care in diagnosing and treating aortic dissections, the defendant-physicians objected, arguing that he was not qualified to testify regarding the standard of care of an emergency-room physician and a family practitioner. After a hearing outside the presence of the jury, the trial court agreed and granted a directed verdict to the doctors.

{¶ 28} On appeal, the court of appeals concluded that the trial court did not abuse its discretion when it excluded Dr. Markowitz's testimony. Although it acknowledged that there was evidence that "lends support to" the plaintiff's position, the court of appeals concluded that there was also sufficient evidence from which the trial court could have determined that Dr. Markowitz was not qualified to testify regarding the standard of care applicable to an emergency-room physician or a family doctor when presented with initial complaints of chest pain. The court noted that, although Dr. Markowitz had previously worked in an emergency room, he had worked exclusively as a surgeon since 1978. In addition, the court cited testimony that, although Dr. Markowitz worked with

emergency-room doctors on a weekly, if not daily, basis, assisting them with diagnoses, his involvement in the diagnosis came at a point when aortic dissection was already strongly suspected as a diagnosis. Thus, the court noted that he did not have recent experience interfacing with patients who came into the emergency room or doctor's office with general complaints of chest pain.

{¶ 29} Although the facts in *Taulbee* are similar to the case before us in many respects, we nevertheless find them to be distinguishable. In the voir dire of Dr. Vermilion, Dr. Mooney made much of the fact that Dr. Vermilion, like Dr. Markowitz in *Taulbee*, typically diagnoses a patient with DVT upon a referral from another physician who had expressed concern about a vascular condition or DVT. Dr. Vermilion testified, however, that the urgent-care physician had contacted the emergency room and expressed concerns that Mrs. Schutte had DVT. When Mrs. Schutte arrived in the emergency room, she was evaluated by Dr. Mooney, in part, for the purpose of determining whether she had DVT. Dr. Vermilion testified that Dr. Mooney was thus presented with a situation similar to that where a family-practice physician or an emergency-room physician might send a patient to him. In other words, Dr. Mooney was asked to "rule out" DVT, much as Dr. Vermilion has been asked to do in his practice.

{¶ 30} Moreover, in the present case, Dr. Vermilion's testimony indicated that he was qualified to testify to the standard of care required of emergency-room physicians who are presented with symptoms of DVT. Although Dr. Vermilion had not practiced emergency-room medicine for 28 years and had not kept current on emergency-medicine literature, he testified that the diagnosis of DVT transcends specialties and that primary-care and emergency-room physicians, as well as vascular surgeons, are routinely required to diagnose DVT. He testified that DVT is "a problem that everyone needs to deal with, and * * * everyone needs to have a basic knowledge of how to diagnose it, how to treat it, how to take care of that type of patient and how to recognize that particular problem." He concluded: "I don't think there's any difference in how the problem would be approached from one specialty to another."

{¶ 31} There is no evidence that the standard of care required of emergency-room physicians in the diagnosis of DVT is lower than that of a vascular surgeon presented with the same symptoms. Dr. Vermilion testified in his deposition that he did not think that his standard of care was "significantly higher than the majority of doctors, particularly the doctors that I deal with," which included many internists and family-practice physicians. In fact, Dr. Vermilion testified in his deposition that the diagnosis of DVT is done primarily by primary-care or emergency-room physicians and that those physicians needed to have a comparable level of familiarity with the diagnosis of the disease. He stated:

{¶ 32} "[T]his is a family practice disease. I may be a specialist, and it may funnel my way, but the people who see these primarily are at the entry level, so it is your ER doctor, your family practice. They don't come to me for swollen legs unless they have been my patient before. They go to the family practice, they go to the ER doctor. Name ten things that family doctors and ER doctors take care of that are life-threatening. On that list has to be DVT. So if you're going to be a competent family practice doctor or ER doctor, you have to know the ins and outs of that disease.

{¶ 33} "It is a family practice disease, ER doctor disease, not vascular surgeon. We may know a lot about clotting and we may see it eventually to treat it, because they may not want to, but they certainly have to be as astute about making the diagnosis as I am because they are the ones who see it. If it were just something I did, we would have everybody dropping over of pulmonary emboli probably.

{¶ 34} "So I disagree with that. You're trying to get me to say that their standard of care should be less than mine, and it should be higher because they are the ones who see all the swollen legs, not me."

{¶ 35} Accordingly, unlike in *Taulbee*, Dr. Vermilion presented significant evidence that the standard of care for the diagnosis of DVT does not vary based on whether the patient presents herself to a family practitioner, an emergency-room physician, or a specialist in vascular disease. Accordingly, the trial court erred in concluding that Dr. Vermilion's lack of recent experience in emergency medicine rendered him unqualified to testify as to the standard of care required of Dr. Mooney.

{¶ 36} The first assignment of error is sustained.

{¶ 37} The judgment of the trial court is reversed, and the cause is remanded for further proceedings.

Judgment reversed
and cause remanded.

FAIN, J., concurs.

DONOVAN, J. concurs in part and dissents in part.

DONOVAN, Judge, concurring in part and dissenting in part.

{¶ 38} I concur in judgment only as to the resolution of the second assignment of error. I disagree with the majority's resolution of Schutte's first assignment of error. The record does not support the conclusion that the trial judge abused his discretion in prohibiting Dr. Vermilion, a vascular surgeon, from testifying as to the standard of care to be applied to an emergency-room physician.

{¶ 39} "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary. A decision is unreasonable if there is no sound reasoning process that would support that decision." *AAA Enterprises, Inc. v. River Place Community Redev. Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597.

{¶ 40} As the majority correctly observed, the facts in *Taulbee* are similar to the case before us in many respects. This similarity and the law dictate a finding that the trial court did not abuse its discretion in excluding Dr. Vermilion's testimony. It was clearly established that Dr. Vermilion had not kept current on emergency-room literature and had not practiced emergency room medicine for some 28 years. It cannot credibly be said that the protocol in an emergency room to diagnose or rule out DVT is analogous to that of a vascular surgeon's private office. The two settings, an emergency room on one hand versus a vascular surgeon's private office on the other, are as different as night and day. The trial court correctly concluded under Evid.R. 702 that Dr. Vermilion "lacked the specialized knowledge, skill, experience, training and education in emergency medicine" to attest to the standard of care of an ER physician in diagnosing DVT.

{¶ 41} A full hearing was held by the trial court before excluding Dr. Vermilion. An analysis of *Taulbee* and Evid.R. 702 occurred. I cannot conclude that the judge abused his discretion.

{¶ 42} I would affirm the judgment excluding appellant's expert and thus affirm the decision of the trial court in its entirety.