**TREVENA et al., Appellants and Cross–Appellees,**

v.

**PRIMEHEALTH, INC., Appellees and Cross–Appellants.**

[Cite as *Trevena v. Primehealth, Inc.*, 171 Ohio App.3d 501, 2006-Ohio-6535.]

Court of Appeals of Ohio,
Eleventh District, Lake County.

No. 2005–L–163.

Decided Dec. 8, 2006.

Paul M. Kaufman, for appellants and cross-appellees.

Erin S. Hess and Stephen E. Walters, for appellees and cross-appellants.

---

WILLIAM M. O'NEILL, Judge.

{¶ 1} This is a medical-malpractice case. Plaintiffs-appellants, Edwin A. Trevena and Sharon A. Trevena ("the Trevenas"), appeal the entry of a judgment by the Lake County Common Pleas Court granting the motions for directed verdict made by defendants-appellees, Robert T. Mulcahy, M.D., Sandeep Kotak, M.D., and Primehealth, Inc. On review, we reverse the judgment of the trial court and remand this matter for a new trial.

{¶ 2} Dr. Mulcahy was employed by Primehealth, Inc. and had been Edwin Trevena's personal physician since 1999. Edwin Trevena ("Trevena") had been diagnosed as a diabetic and had a history of hypertension, coronary artery disease, and atherosclerosis. He was also a smoker.

{¶ 3} Trevena became ill at work on June 2, 2002. He was 52 years of age.

{¶ 4} On June 5, 2002, Trevena was treated in Dr. Mulcahy's office. He complained of dizziness for three days, blurred vision, vomiting, blocked ears, and room spinning. At that time, Dr. Mulcahy made a diagnosis of vertigo/viral syndrome and prescribed medication for the condition.

{¶ 5} Two days later, the Trevenas again called Dr. Mulcahy's office because Trevena's condition was getting worse. The doctor referred Trevena to an ear, nose, and throat doctor for an evaluation for a possible inner ear infection.

{¶ 6} On June 11, 2002, Trevena returned to the doctor's office and saw Dr. Kotak in Dr. Mulcahy's absence.

{¶ 7} On June 12, 2002, the Trevenas contacted the offices of Primehealth and were instructed to go to the emergency room. They did not go to the emergency room that day. Instead, they waited it out until the next day, when Trevena had an appointment with the ear, nose, and throat doctor.

{¶ 8} On June 13, 2002, while on his way to the ear, nose, and throat doctor, Trevena collapsed. An ambulance took him to LakeWest Hospital emergency room, where it was determined that he had suffered a stroke. He remained at LakeWest for approximately one week, and was then transferred to Heather Hill, a long-term care facility in Geauga County, for rehabilitation and therapy.

{¶ 9} While at Heather Hill, Trevena suffered another stroke. He was taken to Geauga Hospital and, eventually, to University Hospitals in Cleveland, Ohio.

{¶ 10} He stayed at University Hospitals for approximately one week and, then, returned to Heather Hill for a number of months. Eventually, he returned home. However, his behavior at home was erratic and uncontrollable. He was admitted to the psychiatric unit of Geauga Hospital and, then, transferred in April 2004 to Chardon Healthcare, where he presently resides.

{¶ 11} During the period June 2, 2002 through April 2004, Trevena suffered seven strokes.

{¶ 12} His physician at Chardon Healthcare was Marian Barnett, M.D. She testified that Trevena will likely remain at Chardon Healthcare, or a similar facility, for the rest of his life. He will never return to gainful employment, he is unable to walk, he has difficulty speaking, and needs assistance to perform routine tasks such as washing, dressing, and personal hygiene.

{¶ 13} The Trevenas filed their complaint for medical malpractice in September 2004. Their complaint alleged that Dr. Mulcahy, Dr. Kotak, and Primehealth fell below the standard of care in treating Trevena. Their theory of liability was that on June 2, 2002, Trevena had suffered a stroke; that on June 5, 2002, when Trevena presented to Dr. Mulcahy's office, and on June 11, 2002, when he was examined by Dr. Kotak, his doctors should have considered a diagnosis that he was having an evolving stroke. Had they done so, according to this theory, they would have done adequate testing of his condition and would have ascertained that Trevena was having an evolving stroke at that time. The Trevenas further contend that had the doctors performed adequate testing, Trevena would have had some mild, residual disabilities instead of total and permanent disability.

{¶ 14} The matter proceeded to trial in August 2005. At the conclusion of the Trevenas' case, appellees made three motions for a directed verdict. One of the motions related to the qualifications of Dr. Bernstein to testify for the Trevenas where he did not practice in the same specialty as appellees. The other two motions for a directed verdict related to issues of standard of care and damages. One motion was made by Dr. Kotak, and the other motion was made by Dr. Mulcahy and Primehealth.

{¶ 15} The trial court overruled appellees' motion for directed verdict as to whether Dr. Bernstein's qualifications were not acceptable and his opinions not admissible. The court also overruled the motion for directed verdict as it related to the standard-of-care issue pertaining to Dr. Mulcahy and Primehealth, but granted the motion as it related to damages. The trial court granted the motion for directed verdict as it related to Dr. Kotak. The trial court's entry was dated September 13, 2005.

{¶ 16} The Trevenas timely appealed that judgment entry to this court, raising a single assignment of error:

{¶ 17} "The trial court erred in granting a directed verdict in favor of the defendants at the close of the plaintiffs' evidence."

{¶ 18} Appellees raise the following cross-assignment of error:

{¶ 19} "The trial court erred in permitting Dr. Bernstein to testify as to standard of care as he was not qualified to render such opinions pursuant to Rule 702 of the Ohio Rules of Evidence."

{¶ 20} The cross-assignment of error will first be considered.

{¶ 21} Evid.R. 702 provides as follows:

{¶ 22} "A witness may testify as an expert if all of the following apply:

{¶ 23} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

{¶ 24} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

{¶ 25} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information."

{¶ 26} "Whether a witness is qualified to testify as an expert is a matter for the court to determine pursuant to Evid.R. 104(A).[1] The competency of the proposed expert witness is a matter left to the discretion of the trial court, and the court's ruling will be reversed only for an abuse of discretion.[2]" 3

{¶ 27} A recent decision from the Second Appellate District summed up the qualifications for an expert witness to state his or her opinion on the standard of care to be observed by a physician who does not practice in the same specialty as the expert witness:

{¶ 28} "In a medical-malpractice case, it is not required that the witness practice in the same specialty as the defendant-physician. 'Where * * * fields of medicine overlap and more than one type of specialist may perform the treatment, a witness may qualify as an expert even though he does not practice the same specialty as the defendant.' [4] The witness must demonstrate, however,

1. *Bedard v. Gardner*, 2d Dist. No. 20430, 2005-Ohio-4196, 2005 WL 1939820, at ¶ 58.

2. *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 157, 10 O.O.3d 332, 383 N.E.2d 564.

3. *Schutte v. Mooney*, 165 Ohio App.3d 56, 2006-Ohio-44, 844 N.E.2d 899, at ¶ 26.

4. *Alexander v. Mt. Carmel Med. Ctr.*, supra, at 158, 10 O.O.3d 332, 383 N.E.2d 564.

that he is familiar with the standard of care applicable to the defendant's school or specialty and that his familiarity is 'sufficient to enable him to give an expert opinion as to the conformity of the defendant's conduct to those particular standards and not to the standards of the witness' school and, or, specialty if it differs from that of the defendant.' [5] '[I]t is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of his qualifications.' [6]

{¶ 29} "It is well established that the expert witness need not be the best witness on the subject.[7] 'The test of admissibility is whether a particular witness offered as an expert will aid the trier of fact in the search of the truth.' [8] " 9

{¶ 30} Thus, the trial court must decide whether an expert witness is qualified to testify pursuant to Evid.R. 104(A), which provides:

{¶ 31} "(A) *Questions of admissibility generally.*—Preliminary questions concerning the qualification of a person to be a witness * * * shall be determined by the court. * * * In making its determination it is not bound by the rules of evidence."

{¶ 32} In this case, the trial court permitted Dr. Bernstein to testify as an expert witness. In his deposition testimony, Dr. Bernstein stated that he was board-certified by the American Board of Psychiatry and Neurology, that he was a member of the American College of Forensic Medicine, that he had consulted in the area of brain injury and strokes at various hospitals in the Pittsburgh area since 1995, and that he sees patients in hospitals 70 to 75 percent of his time.

{¶ 33} At the inception of the trial, the trial court overruled a motion in limine that asked the trial court to prevent Dr. Bernstein from testifying because he was not qualified. The trial court, on the authority of *Alexander v. Mt. Carmel Med. Ctr.*, denied the motion in limine and stated that the fact that Dr. Bernstein was not board-certified in internal medicine did not preclude him from testifying. We agree. Further, a review of Dr. Bernstein's deposition testimony allowed the trial court to conclude that he was familiar with the standard of care expected of an internal medicine specialist when presented with the symptoms and the risks

---

5. Id. at 160, 10 O.O.3d 332, 383 N.E.2d 564.

6. Id.

7. Id. at 159, 10 O.O.3d 332, 383 N.E.2d 564.

8. *Ishler v. Miller* (1978), 56 Ohio St.2d 447, 453, 10 O.O.3d 539, 384 N.E.2d 296.

9. *Schutte v. Mooney*, 165 Ohio App.3d 56, 2006-Ohio-44, 844 N.E.2d 899, at ¶ 24–25.

possessed by Trevena on June 5, 2002, and that he was qualified to state an expert opinion in this regard.

{¶ 34} The subject of Dr. Bernstein's qualifications and whether he should have been permitted to testify came up again at the conclusion of the Trevenas' case-in-chief. Counsel for appellees made a motion to direct a verdict on the basis that Dr. Bernstein was not qualified to render opinions on the standard of care as it pertained to Dr. Mulcahy and Dr. Kotak. The trial court denied a directed verdict based on this ground.

{¶ 35} We find no abuse of discretion on the part of the trial court in permitting Dr. Bernstein to testify and in permitting him to state an opinion on the standard of care expected of Dr. Mulcahy on June 5, 2002.

{¶ 36} The appellees' cross-assignment of error is without merit.

{¶ 37} We will now consider the first assignment of error, and whether the trial court properly granted the appellants' motion for a directed verdict. We review this assignment of error de novo.[10]

{¶ 38} In reviewing a directed verdict, this court construes the evidence "most strongly in favor of the party against whom the motion has been made, without considering the weight of the evidence nor the credibility of the witnesses."[11] In addition, this court "assumes the truth of the evidence supporting the facts essential to the claim of the party against whom the motion is directed, and gives to that party the benefit of all reasonable inferences from that evidence."[12] Further, if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied.[13]

{¶ 39} Civ.R. 50 provides:

{¶ 40} "(A) *Motion for Directed Verdict.*

{¶ 41} " * * *

{¶ 42} "(4) When granted on the evidence. When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence

---

**10.** *Titanium Industries v. S.E.A., Inc.* (1997), 118 Ohio App.3d 39, 47–48, 691 N.E.2d 1087. See, also, *Gliner v. Saint–Gobain Norton Indus. Ceramics Corp.* (2000), 89 Ohio St.3d 414, 415, 732 N.E.2d 389.

**11.** (Citation omitted.) *Ernes v. Northeast Ohio Eye Surgeons, Inc.,* 11th Dist. No. 2005–P–0043, 2006-Ohio-1456, 2006 WL 766567, at ¶ 12.

**12.** *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 68, 23 O.O.3d 115, 430 N.E.2d 935.

**13.** *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 109, 592 N.E.2d 828.

most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

{¶ 43} " * * *

{¶ 44} "(E) *Statement of Basis of Decision.* When in a jury trial a court directs a verdict * * * the court shall state the basis for its decision in writing prior to or simultaneous with the entry of judgment. Such statement may be dictated into the record or included in the entry of judgment."

{¶ 45} Appellees made three separate motions for a directed verdict.

{¶ 46} The first motion for a directed verdict was made with respect to Sandeep Kotak, M.D. The motion was based upon the fact that the testimony of the Trevenas' standard-of-care expert merely opined that when Dr. Kotak saw Trevena on June 11, 2002, there was the possibility of identifying the problem such that Trevena could have had a better outcome. The trial court granted appellees' motion for a directed verdict with respect to Dr. Kotak on the issue of proximate cause. That is, there was no expert testimony that to a reasonable degree of medical certainty, a better outcome for Trevena would have resulted had Dr. Kotak detected his condition on June 11, 2002. The Trevenas do not challenge the granting of this motion for directed verdict on appeal.

{¶ 47} The second motion for a directed verdict, on the ground that Dr. Bernstein was not qualified to render expert opinions in this case, was overruled and has already been discussed above.

{¶ 48} The third motion for a directed verdict related to Dr. Mulcahy and Primehealth, Inc.

{¶ 49} This latter motion requested a directed verdict on the issue of damages. The trial court stated on the record that even if it were to assume that Dr. Mulcahy committed negligence on June 5, 2002 by failing to diagnose Trevena with a vertebrobasilar artery occlusion, or stroke, the testimony of the Trevenas' expert was not definite enough as to the degree to which Trevena would have been better off if such a diagnosis had been made timely. The trial court stated:

{¶ 50} "[F]or purposes of this motion, we will assume that Dr. Mulcahy was negligent, but Plaintiff still has the burden of showing that that negligence proximately caused some damages. Even if we assume the proximate cause issue in regard to resulting in some damages, Plaintiff still has the burden of providing what those damages are. * * * To establish that the Defendant's condition if there—what the Defendants excuse me, what the Plaintiff's condition would have been had there [been] no negligence of the Defendants in this case and there isn't

any medical testimony to that. * * * The only evidence that we have here from Dr. Bernstein is that it would have been basically to a lesser magnitude, wouldn't have been as serious. * * * We don't know what his condition would be. Obviously there is going to be deficit still. We don't know what those are. His opinion solely was it would be of a lesser magnitude. * * * That opinion is going to require speculation on behalf of the jury in this case. * * * [T]here is no evidence that's been presented in this case to show the degree that the Plaintiff's ultimate condition worsened. * * * It is necessary in order for the Plaintiff to have at least established a prima facie case of damages here. * * * So when I do review the evidence in the light most favorable to the non-moving party, the Court is unable to find any evidence with regard to proving damages in this case. * * * So the Court is going to grant Defendant's motion for directed verdict as to Dr. Mulcahy. The case will be dismissed at this time."

{¶ 51} From the standpoint of a sufficiency-of-the-evidence analysis, the elements of a medical-malpractice action that the Trevenas were required to prove were as follows:

{¶ 52} "[I]n order to establish a claim of medical malpractice, a plaintiff must satisfy four basic elements: (1) the existence of a duty owed to the plaintiff by the physician; (2) a breach of this duty by the physician; (3) a showing of the probability that the breach was a proximate cause of the harm to the plaintiff; and (4) damages." [14]

{¶ 53} In stating its reasoning in support of its granting the motion for a directed verdict, the trial court assumed that all the elements of a medical-malpractice action had been established, save for the element of damages. Thus, the trial court said that "we will assume that Dr. Mulcahy was negligent," and further that "even if we assume the proximate cause issue in regard to resulting in some damages." In doing so, it narrowed its focus to the issue of damages, and concluded that the jury would have to speculate on damages based upon Dr. Bernstein's testimony that Trevena's injuries would have been to a "lesser magnitude," without further defining what that "lesser magnitude" would have been. In this regard, the trial court said that "there is no evidence that's been presented in this case to show the degree that [Trevena's] ultimate condition worsened."

{¶ 54} We do not accept that the trial court ordered a directed verdict solely on the issue of damages. Instead, we interpret the trial court's narrative as a dovetailing the issue of damages with proximate cause. There is no question that Trevena sustained damages. He has permanent brain damage and will likely be

---

**14.** *DiSilvestro v. Quinn* (Dec. 31, 1996), 11th Dist. No. 95–L–061, 1996 WL 757519, at *3, citing *Stinson v. England* (1994), 69 Ohio St.3d 451, 633 N.E.2d 532.

a resident of a nursing home for the rest of his life. The question is whether the damages sustained by Edwin Trevena were proximately caused by an act or omission of Dr. Mulcahy.

{¶ 55} To illustrate the point, Dr. Bernstein testified as follows:

{¶ 56} "The other issue is, by allowing the stroke to occur without interdiction will—or treating it, you are then setting the state of affairs where you have primed the pump for further damage."

{¶ 57} The trial court accepted the notion of "priming the pump" in its narrative explanation of why it was granting the motion for a directed verdict. What it did not accept was the theory that in "priming the pump" by his negligent act on June 5, 2002, Dr. Mulcahy was responsible for an unspecified amount of brain damage suffered by Trevena. In the trial court's eyes, the Trevenas' failure to prove in quantitative terms the link between the negligent act of Dr. Mulcahy and the amount of brain damage suffered as a result thereof was fatal to the Trevenas' case. In this regard, we note that the argument of appellees under this assignment of error dwells on the issues of "probability" and "possibility," and the differences between these two concepts, and not on the issue of damages as such. Thus, the issue under this assignment of error is a mixed proximate cause/damages issue, with the greater emphasis on the proximate cause aspect.

{¶ 58} The inability to prove the causal link between the negligent act of the actor and the amount of damages sustained by the injured party has been addressed in those cases dealing with "loss of chance." We believe that this line of cases will be helpful to this analysis.

{¶ 59} In 1996, the Supreme Court of Ohio adopted the "loss of chance" theory in the case of *Roberts v. Ohio Permanente Med. Group, Inc.*[15] and overruled the case of *Cooper v. Sisters of Charity,*[16] which had previously rejected the theory. The court explained its rationale for adopting the theory as follows:

{¶ 60} "[T]he 'loss of chance' theory, which compensates an injured plaintiff for his or her diminished chance of recovery or survival, provides an exception to the traditionally strict standard of proving causation in a medical-malpractice action. Instead of being required to prove with reasonable probability that defendant's tortious conduct proximately caused injury or death, the plaintiff, who was already suffering from some disease or disorder at the time the malpractice

---

**15.** *Roberts v. Ohio Permanente Med. Group, Inc.* (1996), 76 Ohio St.3d 483, 668 N.E.2d 480.

**16.** *Cooper v. Sisters of Charity* (1971), 27 Ohio St.2d 242, 56 O.O.2d 146, 272 N.E.2d 97.

occurred, can recover for his or her 'lost chance' even though the possibility of survival or recovery is less than probable." [17]

{¶ 61} The court further explained its rationale:

{¶ 62} "The rationale underlying the loss-of-chance theory is that traditional notions of proximate causation may unjustly deprive a plaintiff of recovery in certain cases even where the physician is blatantly at fault; thus, the requirement of proving causation is relaxed to permit recovery. As explained by one court, when a patient is deprived of a chance for recovery, 'the health care professional should not be allowed to come in after the fact and allege that the result was inevitable inasmuch as that person put the patient's chance beyond the possibility of realization. Health care providers should not be given the benefit of the uncertainty created by their own negligent conduct. To hold otherwise would in effect allow (health) care providers to evade liability for their negligent actions or in actions [sic].'" [18]

{¶ 63} That court stated that a number of jurisdictions that have adopted the loss-of-chance theory have relied upon 2 Restatement of the Law 2d, Torts (1965), Section 323, which provides as follows:

{¶ 64} "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

{¶ 65} "(a) his failure to exercise such care increases the risk of such harm."

{¶ 66} Finally, the Supreme Court of Ohio stated:

{¶ 67} "Most of the courts that apply Section 323 hold that once the plaintiff proves that the defendant has increased the risk of harm by depriving the patient of a chance to recover, the case can go to the jury on the issue of causation regardless of whether the plaintiff could prove to a degree of medical probability that the defendant caused the patient's injury." [19]

{¶ 68} The Supreme Court of Ohio again approved the loss-of-chance theory and the rationale of the Restatement in the case of *McMullen v. Ohio State Univ. Hosp.*[20] In reviewing the cases dealing with loss of chance, the court noted the

---

**17.** *Roberts v. Ohio Permanente Med. Group, Inc.*, 76 Ohio St.3d at 485, 668 N.E.2d 480.

**18.** Id. at 485–486, 668 N.E.2d 480, quoting *McKellips v. St. Francis Hosp., Inc.* (Okla.1987), 741 P.2d 467, 474.

**19.** Id. at 486, 668 N.E.2d 480.

**20.** *McMullen v. Ohio State Univ. Hosp.* (2000), 88 Ohio St.3d 332, 725 N.E.2d 1117.

common fact pattern where the plaintiff "is already suffering from some injury, condition, or disease when a medical provider negligently diagnoses the condition, fails to render proper aid, or provides treatment that actually aggravates the condition." [21] That court then observed how the theory is applied:

{¶ 69} "Unable to prove that the provider's conduct is the direct and the only cause of the harm, the plaintiff relies on the theory that the provider's negligence at least increased the risk of injury or death by denying or delaying treatment that might have inured to the victim's benefit. The focus then shifts away from the cause of the ultimate harm itself, and is directed instead on the extent to which the defendant's negligence caused a reduction in the victim's likelihood of achieving a more favorable outcome." [22]

{¶ 70} In the instant case, the trial court sent a mixed message in its reasoning before granting appellees' motion for a directed verdict. It stated that it was assuming that negligence on the part of Dr. Mulcahy had been established and that proximate cause had been proven. Only the issue of damages, according to the trial court, had not been established. However, in explaining how it believed that proof of damages was lacking, it was really talking about the issue of proximate cause.

{¶ 71} Our analysis of the loss-of-chance theory demonstrates that the only reasonable way to approach the fact situation at hand is to apply that theory to the case and to allow the jury to decide the issues of fact. The trial court should not have removed these issues from the jury's purview.

{¶ 72} Our reasons for applying the loss-of-chance theory are that the Trevenas' case-in-chief established a prima facie case of medical malpractice, and it also established that Trevena has a diminished chance of recovery as a result of that malpractice. In effect, he has established a prima facie case that he has lost his chance for any meaningful recovery as a result of the malpractice of Dr. Mulcahy. The jury should be permitted to decide the extent to which that malpractice reduced Trevena's likelihood of achieving a more favorable outcome.

{¶ 73} Therefore, we hold that the motion for directed verdict as to Dr. Mulcahy and Primehealth, Inc. was improperly granted by the trial court.

{¶ 74} The Trevenas' assignment of error has merit.

---

21. Id. at 338–339, 725 N.E.2d 1117.

22. Id. at 339, 725 N.E.2d 1117.

{¶ 75} The judgment of the trial court is reversed, and this matter is remanded for a new trial as to Dr. Mulcahy and Primehealth, Inc.

Judgment reversed
and cause remanded.

O'TOOLE, J., concurs.

GRENDELL, J., concurs in part and dissents in part.

DIANE V. GRENDELL, Judge, concurring in part and dissenting in part.

{¶ 76} I concur with the majority's disposition of appellees' cross-assignment of error.

{¶ 77} I dissent, however, as to the remainder of the majority's decision and the majority's reversal of the trial court's judgment and remand for new trial.

{¶ 78} The trial court assumed that all of the elements of a medical-malpractice action, *including the issue of causation,* had been proven, except for the element of damages. In ruling in favor of appellees, the trial court concluded that the jury would have to speculate on the damages. The trial court clearly explained its reasoning, and there is no need for reinterpretation of that reasoning by this court.

{¶ 79} The majority, sua sponte, recasts the trial court's stated analysis into a proximate-cause issue, based upon the loss-of-chance analysis in *Roberts v. Ohio Permanente Med. Group., Inc.* (1996), 76 Ohio St.3d 483, 668 N.E.2d 480, and concludes that the judgment should be reversed and the cause remanded for a new trial to allow the jury to determine the issue of proximate cause.

{¶ 80} In its judgment entry granting a directed verdict, the trial court assumed causation. The question left unanswered by appellants' evidence at trial was the valuation, if any, of the damages resulting from Dr. Mulcahy's negligence.

{¶ 81} Even if we were to assume, arguendo, that the majority's "loss of chance" analysis applied, the case law on that subject makes it clear that although "[t]he plaintiff is not required to establish the lost chance of * * * survival in an exact percentage in order for the matter [of causation] to be submitted to the jury[,] * * * the jury is to consider evidence of percentages of the lost chance in the assessment and apportionment of damages." Id. at 488, 668 N.E.2d 480, citing *McKellips v. St. Francis Hosp., Inc.* (Okla.1987), 741 P.2d 467, 475; *Davison v. Rini* (1996), 115 Ohio App.3d 688, 698, 686 N.E.2d 278. Stated another way, "statistical data relating to the extent of the [plaintiff's] chance of survival is necessary in determining the amount of damages recoverable *after liability is shown."* (Emphasis added.) *McKellips,* 741 P.2d at 476.

{¶ 82} While demonstrating how much of Mr. Trevena's brain damage is attributable to his preexisting condition versus Dr. Mulcahy's negligence may be very difficult, it is clear that appellants bore that burden at trial. By failing to adduce evidence of total damages and by failing to adduce statistical evidence by which a jury could meaningfully apportion them, appellants failed to meet that burden. Based upon the evidence in the record, the trial court rightly concluded that appellants did not meet their burden.

{¶ 83} Allowing the jury to decide the damages issue based on a lack of any statistical evidence to support the jury's finding would lead to rank speculation. That is not the purpose or function of a jury under a loss of chance analysis. Id. ("We do not believe a court should rely solely on a jury's common sense to discount the damage award to reflect the uncertainty of causation").

{¶ 84} The judgment of the Lake County Court of Common Pleas was correct and should be affirmed.