OPINION
{¶ 1} Appellants, Albert F. and Alyce Ernes, appeal from the April 20, 2005 judgment entry of the Portage County Court of Common Pleas, granting a motion for directed verdict of appellees, Northeast Ohio Eye Surgeons, Inc. ("NOES") and Douglas J. Ripkin, M.D. ("Dr. Ripkin").
 {¶ 2} The undisputed facts giving rise to this appeal are as follows: Dr. Ripkin is an ophthalmologist employed by NOES. Dr. Ripkin had been Albert F. Ernes' ("appellant") eye doctor, treating his glaucoma for many years. On May 28, 1998, appellant went to see Dr. Ripkin, complaining of poor vision, trouble with reading, and glare. After conducting some tests, Dr. Ripkin advised appellant to come back in five months. Two weeks later, appellant again went to see Dr. Ripkin, with the same complaints. After conducting more tests, Dr. Ripkin decided to remove appellant's cataract in his left eye.[1]
 {¶ 3} On June 16, 1998, Dr. Ripkin performed the surgery, utilizing a procedure that involved phacoemulsification of the cataract and subsequent implantation of a posterior chamber intraocular lens ("IOL").[2] Appellant was discharged around 11:00 a.m. Later that day, according to appellant's post-operative "progress notes," he called Dr. Ripkin's office, reporting that he had a "terrible headache." He was advised to take his scheduled Valium and Tylenol. Appellant went to see Dr. Ripkin the following day, still experiencing pain. Dr. Ripkin, along with other doctors at NOES, continued to monitor the condition of appellant's eye for the next two months.
 {¶ 4} On July 28, 1998, appellant went to see Dr. Jonathan Sears ("Dr. Sears"), an ophthalmologist at the Cleveland Clinic. Dr. Sears discovered that the IOL was in appellant's sulcus, rather than in his capsule as indicated by Dr. Ripkin's post-operative report.[3]
 {¶ 5} On August 13, 1998, Dr. Sears performed a pars plana vitrectomy, explantated the sulcus based IOL, and injected silicone oil for hypotny.[4] In his post-operative report, Dr. Sears stated that "[t]he ciliary body itself appeared to have been infarcted."[5] In this report, Dr. Sears did not indicate that Dr. Ripkin caused appellant's ciliary body to infarct. Further, Dr. Sears did not indicate that any of the problems that he discovered during appellant's August 13th surgery were caused by Dr. Ripkin during the original cataract removal and IOL implantation.
 {¶ 6} After the surgery, Dr. Sears wrote to Dr. Ripkin that, "if the small amount of ciliary body that is still viable can produce aqueous, Mr. Ernes stands a chance of salvaging his cornea and maintaining pressure." However, on September 1, 1998, Dr. Sears sent a letter to Dr. Ripkin, stating that, "it may well be that Mr. Ernes has had a shutdown of the ciliary body secondary to an ocular ischemic[.]" In a letter dated September 15, 1998, Dr. Sears again wrote to Dr. Ripkin about the lens removal that he performed, stating that, "I think the cause of all this was occlusion with infarction of the ciliary body * * * [that] was uncovered at the time of [the IOL removal and vitrectomy] surgery." By November 17, 1998, Dr. Sears was more certain, noting to Dr. Ripkin that, "[t]he fact that he has these retinal hemorrhages makes me think this is more along the lines of total ocular ischemia[.]"
 {¶ 7} Appellant continued to suffer pain and blindness in his left eye, eventually developing a posterior pole choroidal mass in the eye. On February 28, 2002, Dr. Julian Perry, a doctor of ophthalmic plastic and reconstructive surgery at the Cleveland Clinic, performed an evisceration surgery, removing appellant's left eye.
 {¶ 8} On May 14, 2002, appellant filed a complaint for personal injuries resulting from medical malpractice against appellees, alleging that Dr. Ripkin negligently diagnosed and treated appellant, and as a direct and proximate cause of Dr. Ripkin's negligent care, appellant suffered extreme and substantial injuries, including partial loss of vision. Appellees answered on July 15, 2002. The case proceeded to trial on April 19, 2005. At the close of appellant's case-in-chief on April 20, 2005, appellees moved for a directed verdict, which the trial court then granted.
 {¶ 9} It is from that judgment that appellant filed a timely notice of appeal, and raises the following sole assignment of error:
 {¶ 10} "The trial court erred to the prejudice of [appellants] in directing verdict in favor of [appellees]."
 {¶ 11} In his assignment of error, appellant argues that because his expert presented substantial, competent evidence to support his claim of appellees' negligent conduct, the trial court should have denied appellees' motion for directed verdict since reasonable minds could come to different conclusions as to the cause of appellant's injuries. We disagree.
 {¶ 12} An appellate court reviews a motion for directed verdict de novo as it presents a question of law regarding the legal sufficiency of the evidence. Masek v. Gehring, 11th Dist. No. 2004-G-2569, 2005-Ohio-3900, at ¶ 21. Pursuant to Civ.R. 50(A)(4), the trial court must construe the evidence most strongly in favor of the party against whom the motion has been made, without considering the weight of the evidence nor the credibility of the witnesses. Id. at ¶ 21. If the trial court "finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue." Civ.R. 50(A)(4). However, "[i]f there is substantial, competent evidence favoring the nonmoving party, so that reasonable minds might reach different conclusions, the motion must be denied. Ramage v. Cent. Ohio Emergency Serv., Inc.
(1992), 64 Ohio St.3d 97, 109 * * *." Masek at ¶ 21.
 {¶ 13} The law regarding medical malpractice is well established in Ohio. In DiSilvestro v. Quinn (1996), 11th Dist. No. 95-L-061, 1996 Ohio App. LEXIS 5950, this court aptly summarized the applicable law: "[i]n order to establish a claim of medical malpractice, a plaintiff must satisfy four basic elements: (1) the existence of a duty owed to the plaintiff by the physician; (2) a breach of this duty by the physician; (3) a showing of the probability that the breach was a proximate cause of the harm to the plaintiff; and (4) damages." Id at 6-7, citingStinson v. England (1994), 69 Ohio St. 3d 451.
 {¶ 14} We noted further that "[i]n relation to the second and third elements of the claim, the Supreme Court of Ohio has held: `In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things.'Bruni v. Tatsumi (1976), 46 Ohio St. 2d 127, * * * paragraph one of the syllabus." DiSilvestro at 7.
 {¶ 15} "In applying Bruni, the courts of this state have generally held that, in order to show that the actions of the physician fall below the standard of care, a plaintiff must present expert testimony. * * * Specifically, an expert witness must testify as to the applicable standard of care, the breach of that standard, and proximate cause. * * * Thus, in the context of a motion for a directed verdict, such a motion should be granted when the plaintiff fails to present competent expert testimony concerning the issues of negligence and proximate cause. * * *" Id. at 7-8. (Citations omitted.)
 {¶ 16} Further, we note that although the expert's testimony must establish proximate cause to a degree of medical probability, the expert does not have to establish the standard of care or the breach of that standard to any degree of medical certainty. Bouffard v. Robinson Mem. Hosp., 11th Dist. No. 2002-P-0004, 2003-Ohio-7224, at ¶ 55; Celmer v. Rodgers, 11th Dist. No. 2004-T-0074, 2005-Ohio-7054, at ¶ 28. However, "there is no requirement that an expert utter any `magic language;' i.e. that his opinion was within the reasonable degree of certainty or reasonable degree of certainty within the particular knowledge of his professional experience." Coe v. Young (2001),145 Ohio App.3d 499, 504, citing Miller v. Bike Athletic Co. (1998),80 Ohio St.3d 607.
 {¶ 17} In the case sub judice, appellant argues that his expert, Dr. Carl F. Assaf ("Dr. Assaf"), presented adequate testimony upon which reasonable minds could have differed on the question of proximate cause. Appellees argue conversely that Dr. Assaf's testimony regarding proximate cause did not rise to the necessary level required to establish a prima facie claim of medical malpractice.
 {¶ 18} However, after reviewing the record on appeal, we conclude that appellant did not present substantial, competent evidence that Dr. Ripkin, or NOES for that matter, committed a material breach of any recognized standard of care in removing appellant's cataract and subsequently implanting an IOL. In fact, the record reflects that the operation progressed routinely and without complications, and the level of care executed by Dr. Ripkin and those who assisted him met the recognized standards of surgical practice. Therefore, without a breach of the standard of care, it is elemental negligence law that the issue of proximate cause is moot.
 {¶ 19} Appellant argues that the case should have gone to the jury because his expert provided testimony that although Dr.Ripkin's inadvertent placement of the IOL in the sulcus was not adeviation from the standard of care, his methodology of how he placed the IOL was negligent and caused the trauma to appellant's eye. We disagree.
 {¶ 20} First, this argument assumes that Dr. Assaf established that Dr. Ripkin did in fact place the IOL in the sulcus. However, Dr. Assaf's testimony never established this basic premise. A review of the applicable testimony follows.
 {¶ 21} Dr. Assaf stated that when appellant saw Dr. Sears in August, that:
 {¶ 22} "* * * Dr. Sears found that the lens was not in the [capsulary] bag but in the sulcus, and there was vitreous present. How did vitreous get there, and how did we have a chamber that was collapsed and all these kinds of things? Well, the capsule that the implant goes in behind here is all vitreous. Vitreous is in here. If this gets broken during surgery, vitreous will come out into that area. It's very thin, very fragile. It breaks in the best of hands. But when I read [Dr. Ripkin's] op-report, none of that is there. I markedly question is that op-report accurate. I don't think it's accurate at all."
 {¶ 23} Dr. Assaf goes on to explain what Dr. Sears found when he removed the IOL and performed the vitrectomy. He stated, "[I] [d]on't know what went on with the operation according to [Dr.Ripkin's] op-note, but a lot of trauma went on with that eye because of what Dr. Sears found."
 {¶ 24} Later, Dr. Assaf was asked:
 {¶ 25} "Q. * * * What documents are you privy to that you could explain to the jury your basis for saying that the operative note does not reflect what happened?
 {¶ 26} "A. Well, Dr. Sears's operative report on what he found when he went in in August to try and salvage this eye that was going down hill.
 {¶ 27} "Q. Dr. Sears's report was some seven — eight weeks later, correct?
 {¶ 28} "A. That's correct.
 {¶ 29} "Q. I guess to state the obvious question, couldn't a lot of things have happened to [appellant] in those seven or eight weeks?
 {¶ 30} "* * *
 {¶ 31} "A. * * * What was found by Dr. Sears is this implant had prolapsed through the pupil or opening of the eye, and it was up here with the haptic. * * * It was in the sulcus. * * *
 {¶ 32} "Q. Doctor, is it significant to you in and of itself the phrase `the lens was in the sulcus'?
 {¶ 33} "A. Well, it's significant from the aspect that if it's in the sulcus, and it was put in the sulcus and that was the problem with the operation, that's okay. We knew what we did. We knew the problem. So being in the sulcus is not a bad thing[.] * * * It can be placed in the sulcus if you have enough capsule remnant support, because you have to have the support of this sitting down on this platform otherwise it drops into the vitreous and does not stay in position.
 {¶ 34} "Q. Hypothetically, what if the surgeon inadvertently placed the lens in the sulcus thinking it was put in the bag? Any problem?
 {¶ 35} "A. There shouldn't be. There shouldn't be if it was a clean operation, if there was no vitreous issues and so on, but usually that doesn't happen. That would be a rare instance, because you would see that if you had a capsule bag tear. * * * [S]o you have some choices of what to do if you start to get into complications in the operation. This operation had no complications by the operative note."
 {¶ 36} Dr. Assaf continues to explain that when appellant went to Dr. Ripkin's office the day following the surgery, that there was a lot going on with the eye. He explains that appellant had a lot of pain and swelling. He stated that these symptoms indicated that the eye was in trouble. He then explained that Dr. Ripkin treated appellant's eye conservatively after the surgery.
 {¶ 37} "Q. And you have no disagreement with continuing to treat him conservatively?
 {¶ 38} "A. No, the treatment was proper for what we had going on, but we couldn't answer why it was going on.
 {¶ 39} "Q. And the answer to why it was going on you feel is found in Dr. Sears's report?
 {¶ 40} "A. That's correct.
 {¶ 41} "* * *
 {¶ 42} "Q. And are you relating the condition of the eye as Dr. Sears found it on August of '98 to the surgery of June of '98?
 {¶ 43} "A. Yes.
 {¶ 44} "* * *
 {¶ 45} "Q. And could the trauma of the surgery of June 16th 1998 have caused such a problem with his eye as found in August of 1998 by placing that lens improperly in the sulcus?
 {¶ 46} "* * *
 {¶ 47} "A. Placing the lens in the sulcus did not necessarily cause that. The methodology of how he did it may have caused that damage, and I think it did, because when you put a lens in the sulcus it's a bit more difficult than if you're putting it in the [capsulary] bag, because you've got to get it in the parallel plain. * * * So by it being [in the sulcus] in and of itself, no. The methodology and techniques, yes." (Emphasis added.)
 {¶ 48} Thus, it is clear from this exchange of testimony that in his conclusion that Dr. Ripkin's "methodology" was negligent, Dr. Assaf relies primarily on Dr. Sears' post-operative report. However, in Dr. Sears' post-operative report, as well as in his letters to Dr. Ripkin, no where does he indicate that Dr. Ripkin did anything wrong. Dr. Sears did not indicate that Dr. Ripkin placed the IOL into the sulcus, rather than the capsulary bag. In fact, Dr. Assaf stated in the foregoing testimonial exchange that Dr. Sears had found that the IOL had "prolapsed" into the sulcus. Thus, even Dr. Assaf's own interpretation of Dr. Sears' post-op report shows that Dr. Sears did not indicate that it was Dr. Ripkin who placed the IOL into the sulcus. Thus, appellant did not establish evidence that reasonable minds could conclude that Dr. Ripkin's methodology of placing the IOL into the sulcus was negligent when the evidence does not even show that it was Dr. Ripkin who placed the lens there.
 {¶ 49} Finally, even if we were to assume that Dr. Ripkin inadvertently placed the IOL into the sulcus, believing it to be in the capsulary bag, per Dr. Assaf's own testimony, Dr. Ripkin would not have violated the standard of care in doing so. Regarding this issue, Dr. Assaf testified that, "[t]here shouldn't be [a problem] if it was a clean operation, if there was no vitreous issues and so on[.]" He further testified that if a surgeon cannot put an IOL in the capsulary bag, that putting it into the sulcus is a viable alternative. Thus, besides Dr. Assaf's speculation that something problematic must have happened during this surgery, all the evidence points to a routine, clean operation, performed without any complications, and as such, Dr. Ripkin's methodology, whether he placed the IOL into the capsulary bag or inadvertently into the sulcus, was not negligent.
 {¶ 50} In fact, from reviewing Dr. Assaf's testimony in its entirety, it is evident that he could not identify one incident where Dr. Ripkin acted negligently. He could only surmise that Dr. Ripkin did so. When asked his opinion as to the medical care and treatment provided, Dr. Assaf testified as follows:
 {¶ 51} "Q. * * * Based on your educational, your training, your experience, your background, a review of the records in this matter, specifically those in front of you, your discussions with Mr. Ernes and your knowledge of the facts of this matter, do you have an opinion to a reasonable degree of medical certainty regarding the medical care and treatment provided Mr. Ernes by the [d]efendant?
 {¶ 52} "A. I do.
 {¶ 53} "Q. What is that opinion?
 {¶ 54} "A. That the surgery was not indicated.
 {¶ 55} "Q. Okay. Any further criticism?
 {¶ 56} "A. I would like to see an op-report that reflected what really went on. I can't comment [on] what went on. I can only surmise what went on during that operation.
 {¶ 57} "Q. Do you feel the care provided to him was up to [the] accepted standard of care?
 {¶ 58} "A. No, because he was taken to surgery when all the indicators were not there, and the data doesn't support the need for surgery.[6]
 {¶ 59} "Q. What is your opinion with regards to the surgery that was performed by Dr. Ripkin?
 {¶ 60} "A. Well, if in fact that there was a significant cataract, and if in fact the surgery was done according to the op-report, I have no problem with that, but I don't have an op-report that truly reflects what went on.
 {¶ 61} "Q. With regard to the report of Dr. Sears and what Dr. Sears describes as the condition of the eye, what is your opinion regarding the cause of the ciliary body infarction and the location of the lens as he found it?
 {¶ 62} "A. Well, the lens location reflects that there were problems in that operation, and that's how it's in the sulcus, and that indicates that there was more trauma to that eye during the surgery than is reflected in an ordinary operation, so therefore it was the additional trauma at the time of surgery that led to the ciliary body infarction.
 {¶ 63} "Q. And this additional trauma at the time of surgery, does that fall below the accepted standard of care?
 {¶ 64} "A. I don't know what it was, so I can't comment on that. It may be that if it was a very complex operation with a lot of vitreous issues and so on, it falls within the standard of care, but the whole record is silent on what happened at that operation other than a perfect operative report."
 {¶ 65} Further, upon cross-examination, Dr. Assaf agreed that according to the records provided by St. Clair Surgery Center,the anesthesiologist, and the nurses, that no complications were indicated. He also agreed that the anesthesiologist's records confirmed that the entire procedure only lasted a total of fifteen minutes, well within the average time of fifteen to thirty-five minutes that it normally takes to complete a surgical cataract removal and lens implantation. Moreover, Dr. Assaf admitted that according to all the records, there was no evidence that Dr. Ripkin had to perform a vitrectomy, which would have indicated that he had encountered problems during the surgery.[7]
 {¶ 66} After the exchange in the foregoing paragraph, Dr. Assaf admitted that "[t]he only evidence * * * that anything untoward occurred is in [Dr. Sears'] August 13th surgery note * * *." (Emphasis added.) Again, we note, that Dr. Sears' post-operative report did not indicate that Dr. Ripkin did anything wrong during the original surgery, nor did Dr. Sears indicate that the "trauma" that was going on in the eye was caused by Dr. Ripkin. Further, Dr. Assaf agreed that: "[o]ther than something untoward occurring during the June 16th cataract surgery by Dr. Ripkin, * * * that some sort of trauma to the eye, either physical trauma or mechanical trauma by hand or falling or a stroke, could have caused the ciliary body infarction[.]"
 {¶ 67} The want of evidence here as to any wrongdoing on the part of Dr. Ripkin means that a jury would have to speculate as to whether or not Dr. Ripkin breached the standard of care. The law does not permit such speculation. There must be some
competent evidence that Dr. Ripkin acted negligently.[8]
Here, there is no evidence, let alone competent evidence. Thus, reasonable minds can only come to one conclusion; i.e., that there was no breach of any recognized standard of care.
 {¶ 68} Appellant further argues that Dr. Assaf provided sufficient evidence for a jury to consider that Dr. Ripkin deviated from the standard of care because he performed an unnecessary cataract removal. Appellant's argument is without merit. On direct, Dr. Assaf spent a significant amount of time on this subject, attempting to cast doubt on the results Dr. Ripkin obtained when he tested appellant's visual and brightness acuity.
 {¶ 69} However, on cross, Dr. Assaf negated his earlier testimony. He agreed that two ophthalmologists can differ not only on a diagnosis, but also on a course of treatment for a patient, and both doctors would still be within the standard of care. He further agreed that the tests employed to determine brightness and visual acuity are subjective and that the decision to remove a patient's cataract depends on the results of these subjective tests, as well as an individual patient's complaints on how his poor vision affects his daily living needs.
 {¶ 70} Moreover, even if we were to conclude that appellant presented sufficient evidence that reasonable minds could differ on whether Dr. Ripkin negligently diagnosed appellant, it would not affect our decision. Since we concluded that reasonable minds could only come to one conclusion regarding the fact that the cataract surgery Dr. Ripkin performed was within the standard of care of diligent ophthalmologists, we could not then logically deduce that his negligent diagnosis proximately caused appellant's resulting injuries. Furthermore, Dr. Assaf never disputed the fact that appellant had a cataract in his left eye, just that it rose to the level of requiring surgery.
 {¶ 71} Thus, we conclude that appellants did not present adequate, competent evidence upon which reasonable minds could differ on matter of appellees' negligence and as such, appellants did not establish a prima facie case of medical malpractice. Therefore, appellants' sole assignment of error is without merit.
 {¶ 72} For the foregoing reasons, the judgment of the Portage County Court of Common Pleas is affirmed.
Rice, J., concurs.
O'Toole, J., dissents.
[1] There is some dispute regarding the accuracy of the results obtained with respect to the severity of the vision impairment due to a cataract; however, there is no dispute that appellant had a cataract and had actually had one for quite some time.
[2] Phacoemulsification is a surgical procedure that involves using a device with a vibrating, ultrasonic tip to break up the cataract into tiny pieces, then suctioning the pieces out with a tiny needle. An IOL is an artificial lens that the cataract surgeon places in the patient's eye after removing the eye's natural lens. http://www.allaboutvision.com/resources/glossary-2.htm.
[3] We note that how the IOL got into the sulcus, rather than in the capsulary bag, is a matter of contention. According to testimony elicited from both parties, it could have been inadvertently placed in the sulcus by Dr. Ripkin during the surgery or it could have moved there after the surgery, either through a small tear in the bag, which occurred during the surgery, or after, by some trauma; i.e., rubbing the eye, a fall or a stroke. However, it is clear that Dr. Sears' letters do not indicate that Dr. Ripkin placed the IOL in appellant's sulcus, caused appellant's post-surgery complications, or that Dr. Ripkin was at fault in any way.
[4] A vitrectomy is a removal of the eye's vitreous (clear, gel-like substance that makes up approximately two-thirds of the eye's volume). http://www.theretinasource.com/surgical/procedures/vitrectomy.htm. A pars plana vitrectomy is a removal of the vitreous in the posterior part of the eye's ciliary body. http://www.allaboutvision.com/resources/glossary-2.htm. Hypotny refers to low pressure in the eye. http://allabout vision.com/resources/glossary.htm.
[5] The ciliary body is the part of the eye that lies just behind the iris. Its main functions include accommodation, production of aqueous humor, the clear fluid that fills the front of the eye, and holding the lens in place. http://www.allaboutvision.com/resources/glossary.htm; http://stlukeseye.com/anatomy/Ciliary.asp. An infarct is the necrosis (death) of tissue due to ischemia (lack of blood and oxygen to a bodily organ). http://en.wikipedia.org/wiki/Infarction;http://www.nlm.nih.gov/medlineplus/ency/article/001102.htm; http://www.encyclopedia.com/html/i1/infarcti.asp.
[6] We discuss appellant's negligent diagnosis argument later in this opinion.
[7] Dr. Assaf agreed that if Dr. Ripkin would have encountered problems, requiring him to perform a vitrectomy, then he would have needed additional instrumentation to perform the surgery. There is no evidence that Dr. Ripkin needed additional instrumentation, either in his post-op report, any of the nurses', anesthesiologist's, or other reports.
[8] The facts of this case are similar to the facts in Furnessv. Pois, M.D. (Dec. 22, 2000), 11th Dist. No. 99-P-0014, 2000 Ohio App. LEXIS 6120, where we held that expert's testimony was not sufficient to show a breach (plaintiff alleged that physician negligently injured his brachial plexus nerve in his right shoulder while performing arterial bypass surgery; expert admitted that he did not know how the alleged injury occurred and that his opinion was based solely on the temporal relationship between the date of the surgery and the onset of the plaintiff's tremors). Id. at 16-17. But, see, Celmer, supra, at ¶ 26 (expert testified that physician breached standard of care by failing to order a biopsy after mammogram showed signs of cancer); Bouffard, supra, at ¶ 22 (expert testified that physician failed to obtain adequate medical history);DiSilvestro, supra, at 11-12 (expert testified that physician breached standard of care by not ordering biopsy when thirty-five year old female patient presented with post-coital bleeding);Knapp v. Northeastern Ohio Obstetricians and Gynecologists,Inc., 11th Dist. No. 2002-P-0005, 2003-Ohio-3873, at ¶ 20 (experts testified that physician breached the standard of care by applying excessive traction when guiding the baby through the birth canal).