[Cite as *Gordon v. Trumbull Mem. Hosp.*, 2016-Ohio-5008.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| JANE L. GORDON, | : | **O P I N I O N** |
| Plaintiff-Appellant, | : | |
| - vs - | : | **CASE NO. 2015-T-0080** |
| TRUMBULL MEMORIAL HOSPITAL, c/o NATIONAL REGISTERED AGENTS, INC., et al., | : | |
| | : | |
| Defendants, | : | |
| MOHAMMAD RASHID, M.D., et al., | : | |
| Defendant-Appellee. | : | |

Civil Appeal from the Trumbull County Court of Common Pleas, Case No. 2014 CV 00221.

Judgment: Affirmed.

*Stuart E. Scott* and *Michael A. Hill,* Spangenberg Shibley & Liber, LLP, 1001 Lakeside Avenue, East, Suite 1700, Cleveland, OH 44114 (For Plaintiff-Appellant).

*Gregory T. Rossi, Rocco D. Potenza,* and *Douglas G. Leak,* Hanna Campbell & Powell, LLP, 3737 Embassy Parkway, Suite 100, Akron, OH 44333 (For Defendant-Appellee, Mohammad Rashid, M.D.).

DIANE V. GRENDELL, J.

{¶1} Plaintiff-appellant, Jane L. Gordon, appeals certain evidentiary rulings by the Trumbull County Court of Common Pleas, made during the course of trial for medical malpractice. The issues before this court are whether an expert's opinion as to

causation is admissible where the expert is unable to identify the specific mechanism establishing the causal relationship, whether such opinion is admissible based on the expert's review of the medical records and clinical experience, and whether the jury's determination that the standard of care was not breached renders consideration of proximate cause moot. For the following reasons, we affirm the decision of the court below.

{¶2} On January 31, 2014, Gordon filed a Complaint for medical malpractice in the Trumbull County Court of Common Pleas against Mohammad Rashid, M.D. and others.[1]

{¶3} Gordon alleged that, on February 22, 2013, she suffered "severe femoral nerve injury" in the course of "a take-down colostomy with resection and colorectal anastomosis performed by Defendant Mohammad Rashid, M.D."

{¶4} On February 27, 2014, Dr. Rashid filed his Answer.

{¶5} On October 28, 2014, Gordon and Dr. Rashid entered into the following Joint Stipulation: "Dr. Rashid was the only physician responsible for the selection of the surgical positioning and repositioning of the Plaintiff during the surgery that took place on or about February 22, 2013."

{¶6} On June 2, 2015, Gordon filed her Trial Brief, in which the following theories of liability were set forth:

> Plaintiff asserts that Dr. Rashid was negligent in his placement of
> the Bookwalter retractor resulting in injury to the femoral nerve and
> permanent nerve damage and paralysis. In the alternative, Plaintiff

---

1. The other defendants named in the Complaint – Trumbull Memorial Hospital, Northstar Anesthesia of Ohio, LLC, and Waleed Hamed Sayedahmad, M.D. – were dismissed prior to trial.

2

asserts that if the injury was not caused by negligent retractor placement, then it was caused by negligent positioning of the patient resulting in extreme and unnecessary hyperflexion of the hips.

{¶7} On June 8, 2015, Gordon filed a Motion to Preclude Neil Hyman, M.D. from Offering Opinion Testimony about the Cause of Jane Gordon's Femoral Nerve Injury.

{¶8} Between June 8 and 16, 2015, a jury trial was held.

{¶9} On June 16, 2015, the jury returned a verdict in favor of Dr. Rashid. Jury Interrogatory No. 1A queried: "Was Dr. Rashid negligent in his placement of the retractor blade(s) during the surgical procedure of February 22, 2013?" The jury responded: "No." Jury Interrogatory No. 2A queried: "Was Dr. Rashid negligent in regards to the surgical positioning of Jane Gordon during the surgery on February 22, 2013?" The jury responded: "No." Based on the responses to Interrogatories 1A and 2A, the jury did not answer Interrogatory 1B ("Was Dr. Rashid's negligence with respect to the placement of the retractor blade(s) on February 22, 2013 a proximate cause of an injury to Jane Gordon?") or Interrogatory 2B ("Was Dr. Rashid's negligence in regards to the surgical positioning of Jane Gordon on February 22, 2013 a proximate cause of an injury to Jane Gordon?").

{¶10} On June 18, 2015, the trial court entered Judgment on the Verdict.

{¶11} On July 17, 2015, Gordon filed a Notice of Appeal.

{¶12} On appeal, Gordon raises the following assignments of error:

{¶13} "[1.] The trial court committed prejudicial error when it overruled Plaintiff-Appellant's objection and allowed Neil Hyman, M.D. to testify that Plaintiff-Appellant's

3

nerve injury was an unavoidable and acceptable complication of the surgical position she was placed in during the February 22, 2013 surgery."

{¶14} "[2.] The trial court committed prejudicial error when it overruled Plaintiff-Appellant's objection and allowed Taylor B. Harrison, M.D. to testify that Plaintiff-Appellant's nerve injury was an unavoidable and acceptable complication of the surgical position she was placed in during the February 22, 2013 surgery."

{¶15} Dr. Rashid raises the following cross-assignments of error:

{¶16} "[1.] The trial court abused its discretion in not excluding the proximate cause opinions of plaintiff-appellant's expert, Ann A. Little, M.D."

{¶17} "[2.] The trial court abused its discretion in not excluding the proximate cause opinions of plaintiff-appellant's expert, William P. Irvin, M.D."

{¶18} "The qualification or competency of a witness to testify as an expert or to give his opinion on a particular subject rests with the trial court, and, on appeal, its rulings with respect to such matters will ordinarily not be reversed unless there is a clear showing that the court abused its discretion." *In re Ohio Turnpike Comm.*, 164 Ohio St. 377, 131 N.E.2d 397 (1955), paragraph eight of the syllabus; *Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155, 157, 383 N.E.2d 564 (1978).

{¶19} "Preliminary questions concerning the qualification of a person to be a witness * * * or the admissibility of evidence shall be determined by the court * * *." Evid.R. 104(A).

{¶20} "A witness may testify as an expert if all of the following apply: (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, experience,

4

training, or education regarding the subject matter of the testimony; (C) The witness' testimony is based on reliable scientific, technical, or other specialized information." Evid.R. 702.

> Relevant evidence based on valid principles will satisfy the threshold reliability standard for the admission of expert testimony. The credibility to be afforded these principles and the expert's conclusions remain a matter for the trier of fact. The reliability requirement in Evid.R. 702 is a threshold determination that should focus on a particular type of scientific evidence, not the truth or falsity of an alleged scientific fact or truth.

*State v. Nemeth*, 82 Ohio St.3d 202, 211, 694 N.E.2d 1332 (1998); *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 687 N.E.2d 735 (1998), paragraph one of the syllabus ("[a] trial court's role in determining whether an expert's testimony is admissible under Evid.R. 702(C) focuses on whether the opinion is based upon scientifically valid principles, not whether the expert's conclusions are correct or whether the testimony satisfies the proponent's burden of proof at trial").

{¶21} With respect to expert testimony as to the proximate cause of injury, the Ohio Supreme Court has held that such opinions must be stated in terms of probability:

> The admissibility of expert testimony that an event is the proximate cause is contingent upon the expression of an opinion by the expert with respect to the causative event in terms of probability. * * * An event is probable if there is a greater than fifty percent likelihood that it produced the occurrence at issue. * * * Inasmuch as the expression of probability is a condition precedent to the

5

admissibility of expert opinion regarding causation, it relates to the competence of the evidence and not its weight. * * * Consequently, expert opinion regarding a causative event, including alternative causes, must be expressed in terms of probability irrespective of whether the proponent of the evidence bears the burden of persuasion with respect to the issue.

(Internal citations omitted.) *Stinson v. England*, 69 Ohio St.3d 451, 633 N.E.2d 532 (1994), paragraph one of the syllabus.

{¶22} In the first assignment of error, Gordon challenges the trial court's decision to allow Neil Hyman, M.D., to testify as to the cause of Gordon's post-operative femoral neuropathy. Gordon challenged Dr. Hyman's testimony with respect to causation by pre-trial motion and by oral motion to strike at trial.

{¶23} Gordon relies on statements from Dr. Hyman's pre-trial discovery deposition that he was neither "an expert in femoral neuropathy" nor "an expert on the precise mechanisms of femoral nerve injury." Given these admissions, Gordon contends that Dr. Hyman was "not qualified to testify as an expert on the alleged causal connection between surgical positioning and femoral neuropathy." Appellant's brief at 24.

{¶24} In his pre-trial deposition, Dr. Hyman testified as follows regarding proximate cause testimony he would present at trial:

> Q. We talked about the potential causes for a femoral neuropathy. Are you able to rule out hematoma as a cause in this particular case for causing the femoral neuropathy?

6

A.      The patient had a CT scan after surgery that didn't show a hematoma, so I think that's quite unlikely.

Q.      Same thing with abscess, that would be quite unlikely as well?

A.      Agreed.

Q.      We can probably exclude cutting of the nerve based on her clinical symptoms?

A.      I would agree.

Q.      Do you have an opinion in this case to a reasonable degree of medical certainty where along the femoral nerve the injury occurred?

A.      I don't.

* * *

Q.      Fair enough.   Do you have an opinion again to a reasonable degree of medical certainty whether the mechanism of this injury is either compression or stretching of the femoral nerve?

A.      I believe that this injury occurred in association with the lithotomy position.

Q.      So - - but that doesn't really answer my question, which is, is your opinion * * * that the injury occurred because of compression of the nerve or stretching of the nerve?

A.      Right, and so what I'm saying is my understanding of the mechanism, my understanding of how femoral nerve injuries occur in association with the lithotomy position is that there are a

7

number of different concepts and a number of different thoughts, such as compression of the nerve against the inguinal ligament, theoretically stretch injury. I don't consider myself an expert on the precise mechanisms of femoral nerve injury.

Q.     So you're not going to have an opinion at trial as to the mechanism of how the nerve was injured?

A.     Strictly speaking, no.

Q.     And in fact you're not going to have an opinion whether the injury is caused as a result of compression on the femoral nerve or stretching of the femoral nerve or combination of the two?

A.     Specifically, no. * * * I've read a number of different accounts and explanations, so to my knowledge it's uncertain.

Q.     It's uncertain how the lithotomy position can damage the femoral nerve?

A.     It's uncertain in the particular case of the femoral neuropathy exactly what the mechanism or mechanisms are in a particular patient.

Q.     And that's your understanding after reading the medical literature on femoral neuropathy?

A.     Based on my understanding and review of the medical literature, yes.

Q.     So while it is going to be your opinion at trial that the most likely cause was the lithotomy position, you're not going to be

8

able to explain to the jury how the lithotomy position in this case caused the femoral neuropathy, is that fair?

A. Correct, not with any degree of certainty. * * * To be clear, I won't be able to say as an example that in Ms. Gordon's case the nerve was compressed by the inguinal ligament or it was stretched. I think the neurologist will likely be testifying as to the specifics.

Q. In your experience as a surgeon when you place patients in the low lithotomy position, have you had any patients who have suffered a femoral neuropathy?

A. As I mentioned, I've had a number of patients who have had numbness after surgery and a fewer number who have had motor dysfunction, but to my knowledge they have all been transient.

Q. And were all of those patients in the modified or low lithotomy position?

A. That would be my recall, yes.

* * *

Q. So despite your belief that she was properly positioned in modified or low lithotomy with minimal abduction, it's going to be your opinion that it was that position that caused her femoral neuropathy?

A. That was associated with it, yes.

9

Q.     And you're going to say that to a reasonable degree of medical certainty that was the cause of her femoral neuropathy?

A.     Yes.

Q.     And tell me all of the evidence in your opinion that forms the basis for that opinion that it was lithotomy position or Jane Gordon's positioning that caused her femoral neuropathy?

A.     Certainly.  Well, before we went through the common causes, we talked about hematoma.  We know she didn't have that.  We talked about postoperative abscess.  We know she didn't have that.  There's no reason to believe that * * * the nerve was cut, so that kind of leaves us with retractor and lithotomy position.

With respect to the retractor, Dr. Rashid indicated that he uses the short retractor, the short blade for the Bookwalter retractor, that that's his standard practice.  That's certainly my practice as well; that my understanding is Ms. Gordon was 190 pounds, and the retractor injuries that have been associated with femoral neuropathy it's my understanding that they have generally been the deep blades in a thin patient * * *.  I just can't conceptualize how a short blade in a case like this in Ms. Gordon could possibly compress a femoral nerve.  So I find that completely untenable.

With respect to lithotomy position, the basis is that again, my experience with sensory loss or the few cases of motor function loss have all been in patients with - - who are placed in the

10

lithotomy position. So to my knowledge in my case they've been transient, so that (A), by process of elimination it leaves us with the lithotomy position, and (B), it's completely compatible with my experience that patients with postoperative neuropathy were placed, from the kind of surgery I do, were placed in the lithotomy position, and I am unable in those cases that I've had that, I do the same thing every time. I am unable to identify what we did or what I did in the positioning that was associated with the postoperative neurological defect.

The cases weren't necessarily longer. There was certainly - - I didn't position them any differently, so it's very clear to me that there are patient specific factors that have to do with who gets a neuropathy after surgery, and also that there's a lot about the mechanism of injury that we probably don't understand, being that to my knowledge there is no way - - that nobody's had the experience that they are able to eliminate this injury; only that they have been able to reduce the risk.

{¶25} Based on our review of Dr. Hyman's discovery deposition, we find no abuse of discretion in the trial court's decision to allow him to testify as to the proximate cause of Gordon's femoral neuropathy. Dr. Hyman's proposed testimony on causation, as demonstrated in his discovery deposition, was based on his review of Gordon's medical records, the medical literature, and his own clinical experience. Opinion based on these sources has been deemed scientifically reliable for the purposes of allowing the testimony at trial. *Theis v. Lane*, 6th Dist. Wood No. WD-12-047, 2013-Ohio-729, ¶

11

20 ("review of the medical records by a physician with experience, education, and training pertinent to the subject on which the medical malpractice claim is premised renders his testimony reliable and admissible"); *Sliwinski v. Village of St. Edwards*, 9th Dist. Summit No. 27247, 2014-Ohio-4655, ¶ 14 ("a review of medical records in a medical malpractice action * * *, coupled with [the witnesses'] experiences, are appropriate principles and methodologies to be used by a physician expert in forming medical opinions"); *Chaffins v. Al-Madani*, 11th Dist. Portage Nos. 2002-P-0037 and 2003-P-0090, 2004-Ohio-6703, ¶ 44 ("Dr. Kraus was qualified to testify as an expert" as his "testimony was based on his observations, training, and experience as a pathologist").

{¶26} Gordon raises numerous arguments as to why Dr. Hyman's testimony should have been excluded, even conceding his competence as a surgeon. She notes his inability to explain "how the low lithotomy position can injure the femoral nerve" or "how it could have injured Jane Gordon's femoral nerve." Appellant's reply brief at 6. Dr. Hyman's inability to explain the mechanics of the neuropathy merely reflects the present state of medical knowledge, which, according to his testimony, presents diverse theories to explain the relation between lithotomy and femoral nerve injury. The inability to explain how two circumstances relate causally does not necessarily invalidate testimony establishing the fact of such a relationship. *Smith v. Dillard's Dept. Stores*, 8th Dist. Cuyahoga No. 75787, 2000 Ohio App. LEXIS 5820, 31-32 (Dec. 14, 2000) ("that the scientific community cannot explain *how* or *why* peripheral trauma may result in dystonia * * * goes to the weight of the evidence rather than the reliability of the evidence determining cause and effect") (emphasis sic).

12

{¶27} Gordon faults Dr. Hyman for not being able to point to any "literature demonstrating how the low lithotomy position without abduction or rotation of the hips could cause the injury." Appellant's reply brief at 6. Again, the fact that no such literature may exist does not invalidate Dr. Hyman's methodology nor render his testimony inadmissible. It has been observed that Evidence Rule 702(C) "does not explicitly require an expert to rely on specific medical literature in establishing the reliability of his or her testimony." *Kinn v. HCR ManorCare*, 6th Dist. Lucas No. L-12-1215, 2013-Ohio-4086, ¶ 19.

{¶28} Gordon's remaining arguments, such as the claim that Dr. Hyman's experience with his own patients is "too unreliable under Ohio law" to support his causation opinion since he did not conduct a differential diagnosis to eliminate particular neuropathological causes such as hematoma and abscess or that Dr. Rashid testified at trial that the surgical position he used could not have caused Gordon's injury, bear on the credibility of his opinion rather than its reliability. These claims are not grounds for the exclusion of Dr. Hyman's testimony.

{¶29} The first assignment of error is without merit.

{¶30} In the second assignment of error, Gordon challenges the trial court's decision to allow Taylor Harrison, M.D., to testify that Gordon's femoral neuropathy was caused by compression of the inguinal ligament as a result of surgical lithotomy. Gordon challenged Dr. Harrison's testimony with respect to causation by making an oral motion to strike at trial ("Your honor, * * * we wish to renew the motion to strike what we think are the unreliable opinions of Dr. Harrison who is about to testify * * *."). Although Gordon's oral motion implies the existence of a prior motion to exclude Dr. Harrison's testimony, no such motion is in the record.

13

{¶31} Gordon's arguments with respect to Dr. Harrison's opinions are similar to those raised with respect to Dr. Hyman's opinions. She cites to Dr. Harrison's admission that "he is not an expert on surgical positioning, has never examined Jane Gordon or another patient with a femoral neuropathy following surgery, does not know the specifics of when this surgical position jeopardizes the femoral nerve," and "was unable to identify the specifics of Jane Gordon's surgical position, including the angulation of her legs/hips, the flexion of her legs/hips, the external rotation of her legs/hips, or how long she was in that position." Appellant's reply brief at 10.

{¶32} Gordon questioned Dr. Harrison regarding his opinion as follows from a pre-trial deposition:

Q. Now, it's your opinion in this case that the nerve, the femoral nerve was injured by compression of the inguinal ligament, correct?

A. That's my opinion.

Q. How much force is required to compress the inguinal ligament and cause this type of injury that Jane Gordon suffered?

* * *

A. Well, I think that's difficult to quantify. People can, you know, fall asleep and with * * * positioning during sleep, wake up with their hand numb, and it's simply the amount of weight of the limb, you know, resulting in the symptomatology. I * * * can't offer a minimum amount of force that could cause a neurological injury.

Q. How much abduction is required to compress the inguinal ligament and cause the type of injury that Jane Gordon

14

suffered, the femoral nerve injury at the inguinal ligament, that you believe she suffered?

A.    I don't know.

Q.    In order for the femoral nerve to be injured by compression of the inguinal ligament while in low lithotomy position, does there need to be external rotation of the hips?

A.    External rotation of the hips can further contribute to injury risks.

Q.    So can the femoral nerve be injured by compression of the inguinal ligament while the patient's in low lithotomy without external rotation of the hips?

A.    Yes.

Q.    How?

A.    Because of the fact that these types of injuries have been described even when all proper surgical positioning has been attended to.  The simple fact is that in some individuals for unbeknownst reasons, these injuries happen.

Q.    You don't know how often?

A.    Albeit rare.

*  *  *

Q.    And you said that they do happen, it's been reported, you can't identify any case reports, can you, where this has happened?

A.    I can't recall today.

15

* * *

Q. And I'm asking you, when have you seen this in the past? Did you see this personally? Did you evaluate a patient where this has happened?

* * *

A. Well, I'm not in the operating room with these patients, so, you know, if I see a patient upon, you know, who I'm consulted in the hospital who's got * * * what appears to be a femoral nerve injury, which I've had patients that I've seen - - I do six months of consults here in the Grady Memorial Hospital, and we get called on all manner of patients who have postoperative neurological signs and symptoms. And I've seen people with femoral neuropathies. You know, it's common practice to discuss what the positioning was with the surgeon, but, * * * by and large, I don't know exactly what the positioning was.

Q. How much flexion is required to cause compression of the inguinal ligament and permanent femoral neuropathy?

A. I don't know.

Q. Is there any degree of flexion below which you cannot compress an anatomically normal femoral nerve with the inguinal ligament and cause permanent injury?

A. I don't know.

16

Q.     Are you saying that even one degree of flexion could cause compression of the nerve and cause permanent loss of function?

* * *

A.     I don't know.  I think that, you know, the thrust of things is that the greater the degree of flexion, the higher the risk for injury.

* * *

Q.     Do you know how much hip flexion was involved in the position of Jane Gordon during the surgical procedure on February 22, 2013?

* * *

A.     Well, from review of some of the nurses' testimony or depositions, I just understand that she was in a low lithotomy position.

* * *

Q.     What was the exact mechanism of injury to Jane Gordon's femoral nerve in this case?

A.     It's my opinion that, you know, the best localization for the site of nerve injury is at the inguinal ligament.

Q.     My question to you, though, is can you identify the mechanism of injury or how it actually happened to Jane Gordon, to a reasonable degree of medical certainty?

A.    Well, * * * it's my opinion that likely the mechanism was one of compression.

{¶33} Again, we find no abuse of discretion in the trial court's decision to allow Dr. Harrison's opinion testimony as to the localization and mechanism of Gordon's injury. As was the case with Dr. Hyman, Gordon's objections to the opinion testimony focus on reliability in the sense of the correctness or accuracy of Dr. Harrison's opinions, rather than their reliability in the sense that they are based upon scientifically valid principles. Dr. Harrison opined, based on his training as a neurologist, clinical experience, and the undisputed fact that Gordon was in the low lithotomy position during her reverse colostomy, that her postoperative femoral injury was caused by compression attendant upon her surgical lithotomy. Dr. Harrison stated his reasons for localizing the pathology at the inguinal ligament rather than proximally to it, which would be indicative of a cause other than lithotomy. Knowing the amount of compression or the degree of flexion or abduction may strengthen or weaken the validity of Dr. Harrison's conclusions, but it would not undermine the validity of the methodology on which the opinions are based. For the purposes of determining the admissibility of Dr. Harrison's testimony under Evidence Rule 702(C), it is the validity of the methodology, not the results, that is determinative. *Miller*, 80 Ohio St.3d at 611-612, 687 N.E.2d 735, quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("[t]he focus is 'solely on principles and methodology, not on the conclusions that they generate'").

{¶34} The second assignment of error is without merit.

{¶35} Dr. Rashid asserts, as an alternative means of disposing of Gordon's assigned errors, that the issue, as well as alleged error therewith, of proximate cause is

18

rendered moot by the jury's determination that he was not negligent, both in regards to the placement of the retractor blades and Gordon's surgical positioning. This court reached a like conclusion in *Ernes v. Northeast Ohio Eye Surgeons, Inc.*, 11th Dist. Portage No. 2005-P-0043, 2006-Ohio-1456. In *Ernes*, the trial court granted a motion for directed verdict in the defendants' favor at the close of the plaintiffs' case. On appeal, it was argued, inter alia, that the plaintiffs' expert "presented adequate testimony upon which reasonable minds could have differed on the question of proximate cause." *Id.* at ¶ 17. This court summarily dismissed the argument based on our conclusion that the plaintiffs "did not present substantial, competent evidence that [the defendants] committed a material breach of any recognized standard of care": "without a breach of the standard of care, it is elemental negligence law that the issue of proximate cause is moot." *Id.* at ¶ 18. *See also Callahan v. Akron Gen. Med. Ctr.*, 9th Dist. Summit No. 22387, 2005-Ohio-5103, ¶ 16 (where "[t]he jury unanimously determined that Appellees were not negligent * * *, the jury did not need to engage in an analysis of proximate causation").

{¶36} Gordon counters that such an analysis is inapplicable here, as the issues of proximate cause and negligence "were inextricably intertwined" in the present case. Appellant's reply brief at 4. Specifically, "Dr. Hyman's opinion that Dr. Rashid met the standard of care was based on his unreliable opinion regarding the cause of the Appellant's injury." Appellant's reply brief at 1. We disagree.

{¶37} Dr. Hyman's opinion that Dr. Rashid was not negligent with respect to Gordon's surgical positioning was based on the "positioning and process" of Gordon described by the two nurses who positioned her for surgery. According to the nurses' depositions, "Dr. Rashid * * * inspects the position to make sure that he's happy with it."

19

Dr. Hyman did not, as Gordon suggests, begin with the supposition that her injury was caused by surgical lithotomy and thereafter infer that Dr. Rashid met the standard of care.

{¶38} Accordingly, we find that, even if it were error to admit Dr. Hyman's and Dr. Harrison's proximate cause testimony, such error was harmless in light of the jury's determination that there was no deviation by Dr. Rashid from the standard of care.

{¶39} Dr. Rashid raises two cross-assignments of error challenging the admissibility of Gordon's experts' testimony, on grounds similar to those raised by Gordon.

{¶40} "A person who intends to defend a judgment or order against an appeal taken by an appellant and who also seeks to change the judgment or order or, in the event the judgment or order may be reversed or modified, an interlocutory ruling merged into the judgment or order, shall file a notice of cross appeal within the time allowed by App.R. 4." App.R. 3(C)(1).

{¶41} Dr. Rashid has not filed a notice of appeal and, therefore, the cross-assignments of error are not properly before this court.

{¶42} For the foregoing reasons, the judgment of the Trumbull County Court of Common Pleas, entering judgment on the verdict in favor of defendant-appellee, Dr. Rashid, is affirmed. Costs to be taxed against the appellant.


CYNTHIA WESTCOTT RICE, P.J., concurs in judgment only with a Concurring Opinion,

COLLEEN MARY O'TOOLE, J., dissents with Dissenting Opinion.


_____

20

CYNTHIA WESTCOTT RICE, P.J., concurs in judgment only with a Concurring Opinion.

{¶43} While I concur with the majority opinion, I do not concur in the analysis presented in support of the court's ruling with respect to Dr. Rashid's two cross-assignments of error. This is because, pursuant to the express terms of App.R. 3(C)(1), Dr. Rashid was not required to file a notice of cross appeal.

{¶44} App.R. 3(C)(1) provides that a person intending to defend a judgment against an appeal and who also seeks to change (1) *the judgment* or, in the event the judgment may be reversed, (2) *an interlocutory ruling* merged into the judgment, must file a notice of cross appeal. Thus, there are only two circumstances in which the filing of a notice of cross appeal is required. First, Dr. Rashid in his two cross-assignments of error was clearly not seeking to change the court's judgment. There would have been no reason for him to do that since the judgment was rendered on a defense verdict. Second, since Dr. Rashid's two assigned errors seek to exclude the testimony of appellant's experts in the event of a reversal, he appears to be seeking to change interlocutory rulings. However, Dr. Rashid did not object to the testimony of appellant's experts at trial. Thus, the court was not called on to rule and did not rule on this issue. As a result, there were no interlocutory rulings regarding appellant's experts. Thus, the majority's holding that Dr. Rashid was required to file a notice of cross appeal is incorrect.

{¶45} However, because Dr. Rashid did not object to this testimony below, we should simply overrule his cross-assignments of error on the basis of waiver.

{¶46} For this reason, I concur in judgment only.

21

_____

COLLEEN MARY O'TOOLE, J., dissents, with Dissenting Opinion.

{¶47} Finding merit in both of Ms. Gordon's assignments of error, I would reverse and remand for new trial. I do not believe the testimony of either Dr. Hyman, or that of Dr. Harrison, met the standard for admissibility as expert medical testimony under Evid.R. 702.

{¶48} As the majority acknowledges, to be admissible as expert's testimony, the testimony must be based on "reliable scientific, technical, or other specialized information." Evid.R. 702(C). Further, to be admissible regarding a causative event, the opinion must be expressed in terms of probability. *Stinson*, *supra*, at paragraph one of the syllabus. In this case, both Dr. Hyman and Dr. Harrison couched their opinions in terms of probability – but provided no opinion or information regarding how they reached their conclusions.

{¶49} Dr. Hyman, a surgeon, opined that Ms. Gordon's injury – damage to her femoral nerve – is a recognized, accepted, and unpreventable complication of the surgical position she occupied, known as a low-lithotomy, or modified lithotomy position. However, in his deposition, Dr. Hyman admitted he is not an expert on positional issues. He admitted he is not an expert on neurologic injuries. He could not opine as to where the femoral nerve was injured. He could not opine whether the injury occurred due to compression of the nerve, or stretching of the nerve. He admitted he could not opine as to the mechanics of how the injury occurred. He admitted he could not distinguish whether the injury was most likely caused by lower lithotomy position, or the use of retractors during the surgery in question. He testified he had encountered some

22

patients who suffered temporary neurologic disturbances following surgeries such as that in question, but had never followed up with these patients to discover the cause, since the symptoms resolved themselves.

{¶50} Thus, while Dr. Hyman expressed his belief Ms. Gordon's injury was due to the lower lithotomy position, he could not give *any* explanation of the mechanics of how the injury occurred, or why. Thus, it does not really establish the causation, which *Stinson* demands as a threshold for admissibility of an expert's opinion in a medical malpractice case. There is no reliable scientific or specialized information underpinning his testimony, which Evid.R. 702(C) requires to make the testimony admissible. His opinion was, in fact, a guess.

{¶51} The same problems attend the testimony of Dr. Harrison, the neurosurgeon. At his deposition, Dr. Harrison admitted he is not an expert on surgical positioning. He admitted he has never treated a patient suffering a femoral nerve injury following a surgery where the patient was placed in the low lithotomy position. He admitted he could not say how much hip flexion while in the lithotomy position could lead to injury. He admitted he did not know how much flexion of Ms. Gordon's hips occurred. He stated that injuries like Ms. Gordon's simply occur sometimes, for unknown reasons.

{¶52} The whole purpose of demanding expert testimony in medical malpractice cases is to help the trier of fact understand the possible mechanisms which might lead to the injury sustained. Neither the testimony of Dr. Hyman nor that of Dr. Harrison did this. Their testimony never actually touched causation in a relevant sense, and should have been excluded.

{¶53} I respectfully dissent.