[Cite as *Gibson v. Soin*, 2022-Ohio-1113.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

|  |  |  |
|---|---|---|
| STEVEN WAYNE GIBSON, ADMIN. OF THE ESTATE OF DIANE MARIE GIBSON, DECEASED, et al. | : : : : | Appellate Case No. 29154 |
| Plaintiffs-Appellants | : : | Trial Court Case No. 2019-CV-2594 |
| v. | : : | (Civil Appeal from Common Pleas Court) |
| AMOL SOIN, M.D., et al. | : : | |
| Defendants-Appellees | : | |

. . . . . . . . . .

# O P I N I O N

Rendered on the 1st day of April, 2022.

. . . . . . . . . .

THOMAS M. GREEN, Atty. Reg. No. 0016361, 800 Performance Place, 109 North Main Street, Dayton, Ohio 45402
     Attorney for Plaintiffs-Appellees

SUSAN BLASIK-MILLER, Atty. Reg. No. 0005248 & SHANNON K. BOCKELMAN, Atty. Reg. No. 0082590, Fifth Third Center, 1 South Main Street, Suite 1800, Dayton, Ohio 45402
     Attorneys for Defendant-Appellee David J. Pappenfus, M.D.

JOHN F. HAVILAND, Atty. Reg. No. 0029599 & ELIZABETH D. WILFONG, Atty. Reg. No. 0088712, 6 North Main Street, Suite 400, Dayton, Ohio 45402
     Attorneys for Defendants-Appellees Amol Soin, M.D. and Ohio Pain Clinic, LLC

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Steven Wayne Gibson, Administrator of the Estate of Diane Marie Gibson, deceased, and Roger Gibson (collectively, "the Gibsons") appeal from the trial court's judgment, following a directed verdict, in favor of Amol Soin, M.D., Ohio Pain Clinic, LLC, and David J. Pappenfus, M.D. (collectively, "Defendants") on their medical malpractice and wrongful death claims. The Gibsons also appeal from the trial court's judgment denying their motion for a new trial. For the following reasons, the trial court's judgments will be affirmed.

## I. Facts and Procedural History

{¶ 2} According to the complaint, Diane Gibson had a history of back pain. In September 2015, she sought treatment from Dr. Soin, a pain management specialist who was employed by Ohio Pain Clinic. Two months later, Dr. Soin implanted a temporary spinal cord stimulator to alleviate Mrs. Gibson's back pain. That device was replaced by a Stage II Spinal Cord Stimulator (SCS) on December 31, 2015. In January and February 2016, Mrs. Gibson underwent additional surgical procedures due to an infection at the surgical site and exposed wires from the stimulator. During one of those procedures, the SCS was removed.

{¶ 3} On April 21, 2016, Dr. Soin re-implanted the SCS in Mrs. Gibson's back. Prior to conducting the procedure, he ordered a blood test and an electrocardiogram (EKG) for the purpose of determining whether Mrs. Gibson was healthy enough to undergo the surgery and anesthesia. The bloodwork indicated that Mrs. Gibson had low potassium, and her EKG showed abnormal T waves and prolonged Q waves. Nevertheless, the surgery proceeded as scheduled. Dr. Pappenfus was the

anesthesiologist for the procedure. Two days later, on April 23, 2016, Mrs. Gibson died at home at the age of 64. According to Dr. Soin and Ohio Pain Clinic's appellate brief, the coroner concluded that the cause of death was arteriosclerotic cardiovascular disease with bronchopneumonia contributing. The Gibsons state that she died of cardiac arrhythmia.

{¶ 4} Steven Wayne Gibson, as administrator of Mrs. Gibson's estate, and Roger Gibson, Mrs. Gibson's surviving spouse, originally filed a medical malpractice and wrongful death action against Defendants in October 2017. *Gibson v. Soin*, Montgomery C.P. No. 2017-CV-4647. That action was voluntarily dismissed in March 2019, after Defendants sought to exclude the testimony of the Gibsons' medical expert, Dr. David J. Utlak, a cardiovascular physician who is board-certified in internal medicine and cardiology. The Gibsons refiled the action in this case on June 5, 2019.

{¶ 5} In their complaint, the Gibsons alleged that Mrs. Gibson's low potassium, abnormal T waves, and prolonged Q waves put her at an increased risk of complications, including sudden death, if subjected to the stress of surgery and anesthesia. The Gibsons claimed that Defendants breached their duty of care in failing to review and properly evaluate Mrs. Gibson's presurgical testing and in failing to take steps to remedy the abnormal conditions demonstrated by the tests. The complaint was supported by an affidavit of merit from Dr. Utlak, the same medical expert from the first action.

{¶ 6} Prior to trial, Defendants filed a motion in limine seeking to exclude the testimony of Dr. Utlak. Dr. Utlak was expected to testify, in part, that the failure to refer Mrs. Gibson to a cardiologist prior to surgery was below the standard of care and thus

negligent. Defendants asserted that Dr. Utlak's testimony was irrelevant, did not assist the trier of fact, and did not meet the requirements of Evid.R. 702. They further contended that Dr. Utlak was not competent under Evid.R. 601 to testify against Dr. Soin, a pain management specialist, or Dr. Pappenfus, an anesthesiologist, on the issue of liability. Defs' Motion in Limine, Apr. 7, 2021. Addressing Evid.R. 601(E)(3) (formerly Evid.R. 601(D)(3)), they argued:

> While Dr. Utlak, as a cardiologist, may be qualified to read and interpret an EKG, he does not understand this minimally invasive surgical procedure and anesthesia, its effect on the body, and whether an anesthesiologist or pain management specialist needs to consult with a cardiologist or other specialist prior to surgery. He has no experience as the physician making the initial decision of whether to consult a cardiologist. His involvement occurs after the decision to consult a cardiologist has been made. Having no education, training or experience in pain management, spinal cord stimulators or anesthesia, Dr. Utlak has no competence or expertise to offer an opinion regarding whether or not it was within the standard of care to proceed with the scheduled placement of the spinal cord stimulator on April 21, 2016.

*Id.* at 8. The Gibsons responded that, "[a]s the physician who does the work up for a patient with an abnormal EKG, to whom pain management and anesthesiologists routinely, as a matter of course under the applicable standard of care, refer such patients for assessment, Dr. Utlak is the perfect witness to opine on the standard of care in dealing

with pre-surgical cardiac testing." Pls' Opp. Mem., Apr. 20, 2021, at 2.

{¶ 7} On May 2, 2021, the trial court rejected Defendants' arguments that Dr. Utlak's testimony was irrelevant and unreliable. However, upon review of Dr. Utlak's deposition testimony, the trial court was unable to reach a decision as to whether (1) the doctor was qualified under Evid.R. 702(B) to offer an opinion as to the standards of care applicable to Defendants or (2) Dr. Utlak was competent to testify against Defendants under Evid.R. 601(E)(3). The court held those issues in abeyance pending the Gibsons' questioning of Dr. Utlak at trial as to his qualifications to testify as an expert in the matter.

{¶ 8} A jury trial commenced on May 3, 2021; Dr. Utlak was called to testify on the afternoon of May 4. During his testimony, Dr. Utlak stated that he was involved in cardiac presurgical testing "almost on a daily basis," either through requests from his existing cardiology patients or from surgeons asking him to evaluate whether a patient can withstand a surgical procedure. Trial Tr. 11. When asked "are you familiar with what the standard of care is with respect to reviewing test results and taking action on test results presurgical?" Dr. Utlak responded:

Well, I think that I probably do. I – I think that those things have changed over time. With that being said, there's a lot of common sense just involved with it and, you know, every patient is different. They're – they don't fit, necessarily, into a category of statistical conglomerates, if you will, so you need to make that decision on – on a –* * * specific personal basis for each patient is what I'm trying to say.

Trial Tr. 12.

{¶ 9} Dr. Utlak testified that he was familiar with the standard of care in the pain management surgical field with respect to presurgical cardiac screenings. He explained that "the presurgical clearance for any surgical specialty is the same in terms of a preoperative evaluation to make sure that the patient can withstand the stresses of anesthesia – whatever kind of anesthesia that might be – and the surgical procedure itself, because if some of the things that happen to the human body when we intervene by placing the patient under anesthesia and/or cutting certain parts of the body, if you will, for the surgical procedure which puts the heart and the body under quite a bit of stress. So that really comes under my purview. That does not come under the purview of the surgeon." Trial Tr. 18.

{¶ 10} The Gibsons' counsel further asked Dr. Utlak:

Q   Are you knowledgeable, sir, of the standard of care with respect to the pain management physician's decision on when to contact the heart doctor, such as yourself, in trying to do this sort of presurgical assessment?

A   Yes.

Q   And again, sir, how do you know that?

A   Well, once again, you have to, I think, generalize this not just from a pain management standpoint – from any surgical standpoint. Because what we're dealing with here is the cardiac risk of going through anesthesia and going through the surgical procedure whether it be brain surgery, whether it be carotid surgery or abdominal surgery, aortic surgery, orthopedic surgery, pain management, what have you. The – the judgment of the –

of the cardiologist in a case to determine the risk of a cardiac event occurring is in our purview and nobody else's. That doesn't mean that the surgeons or pain management surgeons, if you will, don't – aren't involved in that. They're involved in that decision, of course. But the bottom line is that when it comes to the expertise to know when and – when or when not a patient should go through any surgery if there are cardiac issues is clearly and purely and only in the purview of either the internist who feels comfortable with that and/or the cardiologist which is where most of the patients end up.

Trial Tr. 18-19.

{¶ 11} The Gibsons' counsel asked similar questions with respect to the standard of care for anesthesiologists and received similar answers from Dr. Utlak. When asked how he knew the standard of care for an anesthesiologist in doing presurgical cardiac screening, Dr. Utlak reiterated that "the cardiac issues are not within the expertise of anesthesiologists nor are they in the expertise of any surgeon or pain management doctor. They're within the purview of the expertise of a cardiologist and, potentially, an internist who might have some cardiology training * * *." *Id.* at 20.

{¶ 12} After hearing argument from counsel, the trial court orally sustained Defendants' objection to Dr. Utlak's expert testimony. Although the court found that Dr. Utlak was qualified as a cardiologist for purposes of Evid.R. 702(B), it concluded that he did not satisfy the competency requirements of Evid.R. 601(E)(3). After discussing two cases that had been cited by the parties, the court stated:

* * * Dr. Utlak has testified that the expertise to know whether or not surgery should go forward is in his purview only and that he's the expert in that matter, not them.

Thus, there was not any testimony as to what a pain management specialist or an anesthesiologist goes through with respect to their review of a presurgical testing that would include a pre – or a cardiac workup. What they look at, what they review, how they review it and the extent to their knowledge of their review [sic] of any – in this case, an EKG or potassium level and how they make that evaluation before they make a determination then to send a case to a cardiologist which is then when Dr. Utlak would pick up the case much like the *Taulbee* case. It gets picked up later on in that.

Thus, a preoperative review of that basic metabolic panel and the EKG viewed in light of whether or not they're fit for surgery was not testified to as what the standard of care then would be and how they review it and when a referral would then be made to the cardiologist for their seeking that higher level diagnosis.

Thus, this Court finds that Dr. Utlak is not competent to testify to the standard of care of the anesthesiologist or the pain management physician in performing this surgery.

Trial Tr. 31-32.

{¶ 13} Following the trial court's ruling, counsel for the Gibsons provided an oral

proffer of Dr. Utlak's anticipated testimony and also referred the trial court to his deposition testimony. Defendants then moved for a directed verdict, which the trial court granted. On May 7, 2021, the trial court issued a judgment entry that (1) memorialized its grant of Defendants' motion for a directed verdict at the close of the Gibsons' case-in-chief and (2) entered judgment in favor of Defendants and against the Gibsons.

{¶ 14} Three days later, on May 10, 2021, the Gibsons filed a motion for a new trial on the ground that the trial court abused its discretion in finding Dr. Utlak incompetent as an expert witness. Before the trial court ruled on that motion, they appealed from the May 7, 2021 judgment. At the Gibsons' request, we remanded the matter to the trial court to resolve the pending motion for a new trial. Decision and Entry, June 24, 2021. The trial court denied the motion on June 29, 2021, following which the Gibsons filed an amended notice of appeal to include that ruling.

{¶ 15} The Gibsons raise two assignments of error, which we will address together.

## II. Competence of Medical Expert Under Evid.R. 601

{¶ 16} In their first assignment of error, the Gibsons claim that the trial court "erred as a matter of law in finding that [their] expert witness, David J. Utlak, M.D., was incompetent to give expert testimony pursuant to Evid.R. 601(D)(3) [sic]." Their second assignment of error claims that the trial court erred in overruling their motion for a new trial, which raised a similar issue.

{¶ 17} Evid.R. 601 governs the competency of a witness. When the Gibsons' complaints were filed, Evid.R. 601(D) addressed the competence of a witness to testify regarding liability in a medical claim. The Rule was amended in 2020 and 2021, and

both amendments caused the medical expert provision to be renumbered.  By the time of trial in May 2021, Evid.R. 601(D) had been renumbered to Evid.R. 601(E).  Effective July 1, 2021, that provision is now Evid.R. 601(B)(5).  The 2020 and 2021 amendments made no substantive changes to the provision.

{¶ 18} In general, every person is competent to be a witness.  Evid.R. 601(A).  However, Evid.R. 601(B)(5) disqualifies persons from giving expert testimony on liability in medical claims unless:

(a) The person testifying is licensed to practice medicine and surgery, osteopathic medicine and surgery, or podiatric medicine and surgery by the state medical board or by the licensing authority of any state;

(b) The person devotes at least one-half of his or her professional time to the active clinical practice in his or her field of licensure, or to its instruction in an accredited school and

(c) *The person practices in the same or a substantially similar specialty as the defendant.  The court shall not permit an expert in one medical specialty to testify against a health care provider in another medical specialty unless the expert shows both that the standards of care and practice in the two specialties are similar and that the expert has substantial familiarity between the specialties.*

Evid.R. 601(B)(5).

{¶ 19} The third prong is a relatively new provision.  When Evid.R. 601 was adopted in 1980, it was not part of the Rule, nor was it part of R.C. 2743.43, the statute

that Evid.R. 601 incorporated in part. It was added to R.C. 2743.43 in 2004, *see* 2004 Sub.H.B. 215, and included in the 2016 amendments to Evid.R. 601(B).

{¶ 20} "A trial court has discretion to determine whether a witness is competent to testify as an expert, and the trial court's decision will not be reversed absent a clear showing that the court abused its discretion." *Celmer v. Rodgers*, 114 Ohio St.3d 221, 2007-Ohio-3697, 871 N.E.2d 557, ¶ 19; *see also* Evid.R. 104(A) ("Preliminary questions concerning the qualification of a person to be a witness * * * shall be determined by the court[.]"). The trial court abuses its discretion when its decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 21} Pursuant to the first sentence of Evid.R. 601(B)(5)(c), Dr. Utlak would not be qualified to offer expert testimony about the standard of care unless he "practice[d] in the same or a substantially similar specialty" as Dr. Soin and/or Dr. Pappenfus. Dr. Utlak is a cardiologist. Dr. Soin and Dr. Pappenfus are a pain medicine specialist and an anesthesiologist, respectively. There was no evidence that Dr. Utlak practiced "the same or a substantially similar specialty" as those practiced by Dr. Soin and Dr. Pappenfus. *See Rose v. Tievsky*, 2d Dist. Montgomery No. 29024, 2021-Ohio-3051, ¶ 94 (family practice physician's affidavit could not be substituted for a proper Civ.R. 10(D)(2) affidavit of merit where the doctor failed to meet the requirement of Evid.R. 601(B)(5)(c); the doctor provided no evidence that his specialty was the same or substantially similar to that of the defendant, a radiologist); *Couch v. Dayton Pain Ctr., LLC*, 2d Dist. Montgomery No. 28891, 2021-Ohio-1428, ¶ 18 (a neurosurgeon's testimony about standard of care

applicable to defendant-physician, who was board-certified in other specialties, was subject to exclusion).

**{¶ 22}** The Gibsons assert that Dr. Utlak satisfies the second sentence of Evid.R. 601(B)(5)(c), which states that a "court shall not permit an expert in one medical specialty to testify against a health care provider in another medical specialty *unless the expert shows both that the standards of care and practice in the two specialties are similar and that the expert has substantial familiarity between the specialties.*" (Emphasis added.) They emphasize that Dr. Utlak testified that the standard of care for recognizing and taking action concerning presurgical cardiac testing is the same across all three specialties – cardiology, pain management surgery, and anesthesiology. They also point to Dr. Utlak's testimony that he is regularly involved in the presurgical cardiac screening performed by surgeons and anesthesiologists, such as Drs. Soin and Pappenfus.

**{¶ 23}** Upon review of the record before us, the trial court did not abuse its discretion in concluding that Dr. Utlak did not satisfy the requirements of Evid.R. 601(B)(5)(c).

**{¶ 24}** At the outset, there is no question that Dr. Utlak is well-versed in presurgical cardiac testing. He indicated that it is a large part of his practice and that he is involved in such testing "almost on a daily basis." He stated, however, that his involvement typically occurs upon direct referral from surgeons or when his existing cardiology patients request presurgical testing on behalf of their surgeon. When asked about the standard of care with respect to reviewing presurgical test results and taking action based on those

results, Dr. Utlak indicated that "every patient is different" and any decision needed to be made on a "specific personal basis for each patient."

{¶ 25} Dr. Utlak testified, generally, that he was familiar with the standard of care for presurgical cardiac testing by a pain management specialist, such as Dr. Soin, or an anesthesiologist, such as Dr. Pappenfus. He stated that the standard of care is the same for all surgical specialties and for anesthesiologists with respect to a preoperative evaluation to make sure that the patient can withstand the stresses of anesthesia and the surgical procedure itself. Dr. Utlak further testified, generally, that he was knowledgeable about the standard of care with the respect to both a pain management specialist's and an anesthesiologist's decision on when to contact a cardiologist.

{¶ 26} When asked to elaborate, however, Dr. Utlak did not say that he and Defendants shared similar standards of care, and he did not testify that he and Defendants would review the same information and use a similar standard of care in determining whether further cardiac testing were required prior to surgery. Instead, when asked how he knew of the standards of care, Dr. Utley expressed that only a cardiologist or certain internists have the expertise to know when a patient with cardiac issues should go through a surgical procedure.

{¶ 27} Based on Dr. Utlak's testimony, the trial court reasonably concluded that Dr. Utlak did not establish that (1) the standard of care and practice for a cardiologist upon referral and the standard of care for Defendants with respect to presurgical cardiac testing were similar and (2) Dr. Utlak had substantial familiarity with the standards of care required of Drs. Soin and Pappenfus.

{¶ 28} In concluding that Dr. Utlak was not competent to testify as an expert on the standard of care in this case, the trial court focused on two cases: *Taulbee v. Dunsky*, 12th Dist. Butler No. CA2003-03-059, 2003-Ohio-5988, and *Schutte v. Mooney*, 165 Ohio App.3d 56, 2006-Ohio-44, 844 N.E.2d 899 (2d Dist.), which distinguished *Taulbee*. The trial court cited *Schutte* as an example of when an expert in a different specialty has "substantial familiarity" with another specialty and cited *Taulbee* as an example of when that did not occur. We note that both cases were decided prior to the adoption of former Evid.R. 601(D)(3), and both concerned expert testimony under Evid.R. 702, not Evid.R. 601. To the extent that *Taulbee* and *Schutte* are instructive, we agree with the trial court's assessment that this case is analogous to *Taulbee*.

{¶ 29} In *Taulbee*, the plaintiff took her husband to the emergency room because he was complaining of chest pain. He was diagnosed with chest wall pain, given medication, and advised to see his family physician if he did not improve. Three days later, he contacted his family physician, who diagnosed gastroesophageal reflux disease. He died two days later of an aortic dissection. His widow sued the family physician and the emergency-room physician for failing to properly diagnose him.

{¶ 30} At trial, the plaintiff attempted to present the testimony of a cardiothoracic surgeon regarding the standard of care in diagnosing and treating aortic dissections. The defendant-physicians objected, arguing that he was not qualified to testify regarding the standard of care of an emergency-room physician and a family practitioner. The trial court agreed and granted a directed verdict to the doctors.

{¶ 31} On review, the Twelfth District concluded that the trial court did not abuse

its discretion when it excluded the proposed expert's testimony. The trial court had made clear that it was not excluding the expert's testimony because of his specialty, but because "he had not provided sufficient evidence to show that he was familiar with the standard of care applied to emergency room physicians and family care practitioners." *Taulbee* at ¶ 21. The appellate court noted that, although the proposed expert had previously worked in an emergency room, he had worked exclusively as a surgeon since 1978. In addition, although he worked with emergency-room doctors on a weekly, if not daily, basis, assisting them with diagnoses, his involvement in the diagnosis came at a point when aortic dissection was "already strongly suspected as a diagnosis." *Id.* at ¶ 22. The proposed expert, therefore, did not "have recent experience interfacing with patients who come into the emergency room or doctor's office with general complaints of chest pain." *Id.* Although the cardiothoracic surgeon "was highly qualified to diagnose and treat aortic dissections," the doctor's "involvement as a cardiothoracic surgeon comes at a much later point in the clinical picture than the situation where a person initially consults a physician for problems." *Id.* at ¶ 24.

{¶ 32} We distinguished *Taulbee* in *Schutte*. In that case, Schutte went to the emergency room on the advice of an urgent-care physician, who suspected that she had developed deep vein thrombosis (DVT) in her left leg. The urgent-care physician also called the emergency room concerning her suspicions and indicated that Schutte was on her way. The emergency-room physician conducted a physical examination, ordered a venous Doppler ultrasound, and concluded that the test was negative. Schutte was released and later died of pulmonary thromboembolism.

{¶ 33} In his medical malpractice action, Schutte's surviving spouse prepared to present the testimony of a vascular surgeon. The emergency-room doctor-defendant objected, under Evid.R. 702(B), to the proposed expert's qualifications to testify as to the standard of care to be applied to an emergency-room physician. Citing *Taulbee*, the trial court sustained the objection, but we reversed. We noted that, although the proposed expert typically diagnosed a patient with DVT upon a referral from another physician who had expressed concern about a vascular condition of DVT, the emergency-room physician had been in a similar scenario, as the urgent-care physician had contacted the emergency room and expressed concerns that Schutte had DVT. Moreover, unlike the proposed expert in *Taulbee*, Mr. Schutte's proposed expert "presented significant evidence that the standard of care for the diagnosis of DVT does not vary based on whether the patient presents herself to a family practitioner, an emergency-room physician, or a specialist in vascular disease." *Id.* at ¶ 35. We thus held that the trial court erred in concluding that the expert's lack of recent experience in emergency medicine rendered him unqualified to testify as to the standard of care required of the emergency-room physician.

{¶ 34} Here, Dr. Soin had ordered presurgical cardiac testing, and both he and Dr. Pappenfus made a determination that Mrs. Gibson's surgical procedure could proceed without first referring her to a cardiologist. Dr. Utlak typically evaluates whether a patient is healthy enough to proceed with a surgical procedure upon referral from the surgeon, either directly or indirectly. Although Dr. Utlak asserted generally that he was familiar with the standard of care required of Defendants, he did not testify that he and Defendants

shared a similar standard of care; rather, he testified that the expertise to determine whether a surgical procedure should proceed was within his purview as a cardiologist. In addition, Dr. Utlak did not testify that his standard of care when evaluating a referred patient was a similar standard of care required of a surgeon or anesthesiologist upon reviewing presurgical cardiac testing results. As noted by the trial court, there was no testimony about what Defendants should review when determining whether to refer a patient to a cardiologists and how Dr. Utlak was familiar with that standard of care. In short, we agree with the trial court that the circumstances present were analogous to *Taulbee*.

{¶ 35} The trial court did not abuse its discretion in concluding, pursuant to Civ.R. 601, that Dr. Utlak was not competent to give expert testimony as to the Defendants' standard of care in this particular case. The Gibsons' assignments of error are overruled.

### III. Conclusion

{¶ 36} The trial court's judgments will be affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and LEWIS, J., concur.

Copies sent to:

Thomas M. Green
Susan Blasik-Miller
Shannon K. Bockelman
John F. Haviland
Elizabeth D. Wilfong
Hon. Mary E. Montgomery